*13*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 0 1 1997

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| MARK BAILEY, D. C., | § | |
| TODD BOYD, D. C., CURTIS COOK, D.C., | § | |
| AND ALEJANDRO LEAL, | § | |
| d/b/a XCLUSIVE HAIR DESIGNS and | § | |
| RITA CARTRIGHT, d/b/a RITA'S | § | |
| BEAUTY SALON          Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| DAN MORALES, as Attorney General | § | |
| of the State of Texas | § | B-97-206 |
| Defendant | § | |
| | § | |
| In his Respective Official Capacity. | § | |

## PLAINTIFFS' BRIEF REGARDING THE SCOPE AND
## CONSTITUTIONALITY OF H.B. 1327

Plaintiffs respectfully represent:

### A.  SCOPE OF H.B. 1327

1.     H.B. 1327 bans a broad range of truthfull communications by certain professionals to

their prospecive clients.  "Professionals" is defined to mean an attorney, chiropractor, physician,

surgeon, private investigator, or any other person licensed, certified, or registered by a state agency

that regulates a health care profession. (Subdv.12)   Named plaintiffs in this case include two licensed

chiropractors and two licensed cosmetologists.

2.     As set forth in Plaintiffs' Original Complaint, H.B. 1327 bars certain professionals

from communicating with prospective patients,   in-person or by telephone about a particular

occurrence or event, or an existing problem of the prospective client, unless the prospective client

or a member of the propsective client's family has requested or initiated the communication.(Subdv. 11, H.B. 1327)   These prohibited communications apply to direct communications by the professional as well as indirect communications through association or financing of others to perform such communications on behalf of the professional.(Sect.2, H.B.1327)

3.     H.B. 1327 includes certain narrow exceptions to this blanket prohibition: namely, communications initiated by a family member of the person receiving a communication, a communication by a professional who has a prior or existing professional-client relationship with the person receiving the communication, or certain communications by an attorney for a nonprofit organization (Subdivision 11, H.B. 1327).   Query:  If an attorney and a medical doctor are both retained by a nonprofit organization for the disabled, why does H.B. 1327 permit an attorney to initiate communications helping members  recognize a legal  problem, but prohibits the medical doctor from initiating communications with those same members regarding a medical problem?

4.     H.B. 1327 also does not target or limit its application to misleading or deceptive communications.  Instead,  H.B. 1327  operates as a complete and total ban against the proscribed communications; and no warnings or disclosures made with the communication, regardless of how truthful or informative the communication may be,  can rescue the communicator from committing an offense of Barratry under the broad sweep of H.B. 1327's definition of "Solicit employment". In fact, truthful communications in violation  of H.B. 1327's ban on free speech constitute a third degree felony. Texas Penal Code §38.12(f).

5.     Plaintiffs do not challenge H.B. 1327's provisions as set out at § 38.12(a)(1), which are apparently aimed at the legal profession and prohibits a person from instituting a suit or claim that the person is not authorized to pursue.

2

065

6.     By contrast, Plaintiffs challenge as unconstitutional H.B.1327's definition of "Solicit Employment" in light of the prohibitions as set forth in §38.12(a)(2), §38.12(a)(4), §38.12(a)(5),  and §38.12(6) -- all of which describe a broad range of circumstances under which Professionals must not **"solicit employment"** as defined at §38.01(11).  Plaintiffs further challenge H.B.1327's prohibitions as set forth at §38.12(b), which extend the prohibitions concerning "solicit employment" to funding the solicitation of employment or accepting employment which resulted from the the solicitation of employment.  Thus, §38.12(b) logically survives or fails constitutional challenge in concert with the concept of criminalizing "solicitation of employment" as set forth in §38.01(11) and §38.12(a)(2,4,5 & 6).

7.     Before delving into the prohibitions concerning "solicitation of employment," Plaintiffs would respectfully point out that §38.12(a)(3) presents one of the most poorly conceived statutory prohibitions in the Texas Legislature's history:  §38.12(a)(3) prohibits giving or offering to give a prospective client "money or anything of value to obtain employment as a professional from the prospective client." Nothing within §38.12(a)(3) references "solicit employment" and solicitation of employment as defined at §38.01(11) is not a prerequisite to running afoul of §38.12(a)(3).  In other words, there is no requirement that the professional communicate with the prospective patient telephonically or in-person;  a simple advertisement or a written letter is enough.  Also, the prohibitions as set forth at §38.12(a)(3) apply to even those communications initiated <u>by the prospective patient or client</u>.  Further, §38.12(a)(3)'s prohibitions about giving or offering to give anything of value to obtain employment do not exclude the very professional services for which the professional was trained and certified.  Thus, for example, in response to a telephone call by a prospective patient,  a chiropractor may not offer a free examination;   in response to an inquiry by

3

066

a potential client, an attorney may not offer to review their file and hold a consultation on the matter at no charge; and in response to a telephone call <u>initiated by the prospective customer</u>, a cosmetologist may not offer a free "perm" or a free "haircut" or "anything of value." H.B. 1327's prohibitions as set forth at §38.12(a)(3) were probably not intended to prohibit giving or offering professional services in order to obtain employment; nonetheless, by its literal terms, §38.12(a)(3) prohibits giving or offering to give professional services if this is done in order to obtain employment as a professional.

8.      Even if this Court could modify §38.12(a)(3) to exclude professional services from the ambit of "anything of value," Plaintiffs request that this Court take judicial notice of the historical and widespread practice of offering promotional items as a method of marketing services to prospective clients and patients. Under §38.12(a)(3), Plaintiff cosemetologists may not give free combs, or free hair care products if they do so in an effort to obtain professional employment. Under §38.12(a)(3), Plaintiff chiropractors may not offer free chiropractic adjustments, free heat pads, or "anything of value" if they do so in an effort to obtain professional employment. Regardless of this Court's decision regarding the constitutionality of those prohibitions concerning "soliciation of employment" as defined under H.B.1327,§38.01(11),    §38.12(a)(3)'s even broader proscriptions against giving or offering to give anything of value in order to obtain professional employment must fail as an assault against fundamental freedoms and is blatantly unconstitutional.

9.      Regarding the criminalization of "soliciting employment" as defined by §38.01(11) and §38.12(a)(2,4,5 & 6), Plaintiffs' Original Complaint contained a wide variety of specific conduct that Plaintiffs engaged in and intended to continue engaging in, but for the proscriptions as set forth in H.B.1327 -- all of which are incorporated into this supplemental brief. Some specific examples

4

of the type of conduct that H.B. 1327 bans are as follows:

a. A chiropractor may not visit a senior citizens' home to advise seniors that chiropractic may benefit older people with arthritis and joint pain;

b. A chiropractor may not telephone nor hire someone to telephone older people with arthritis nor any group known to the chiropractor to be in greater need of chiropractic than the general populaiton;

c. A chiropractor may not provide "screenings" (e.g. chiropractic consultations) at conventions by approaching convention attendees who appear to need some type of physical therapy or chiropractic to discuss the benefits of treatment; yet the same chiropractor may request that attendees who appear perfectly healthy discuss the benefits of treatment;

d. A cosmetologist may not notice a person's hair problem and suggest how that cosmetologist might correct the problem or provide a style that minimizes or hides the hair problem;

e. Under H.B.1327 professionals licensed, registered or certified by a state agency that regulates their respective profession may telephone or solicit hair replacement/growth treatment to the general public; but if they discover that the potential patient/client has thinning hair, that same communication now subjects the professional to criminal sanction;

f. A nurse may travel up and down the street offering in-home health care to her neighbors, but upon discovering or knowing of someone who has a "problem" regarding their mobility or having a health "problem" which would make it more likely that such person could benefit from the nurse's prooffered services, such a communication instantly becomes illegal under H.B.1327.

g. A medical doctor may apparently stop and render aid to an injured person so long as that person is unconscious, but if the injured person is conscious and the doctor communicates about the proposed medical treatment, the doctor can avoid criminal sanction only if the doctor can prove that he is making the communication without any intent to obtain an economic benefit. Query: What if the doctor's office later sends a bill to a grateful patient?

h. Does a prospective patients' decision to answer the telephone suggest that such person has requested a communication from the chiropractor? Probably not! Does attendance at a free seminar demonstrate that a person has requested the communication from the podium regarding a general problem

5

068

burdening the patient?  One would certainly hope so.  But what about the followup, in-person solicitation or telephonic solicitation of people who attended the seminar?  These people did not request the subsequent communication soliciting their business;  and their very attendance at the seminar most likely provided the professional with constructive knowledge of their problem, accident, injury, etc. Thus, any followup communication by or on behalf of a chiropractor to this target group would probably run afoul of H.B. 1327 unless the person initiates the followup communication.   Does raising ones hand at the seminar or a glancing look of curiosity properly suggest to the chiropractor that he may individually communicate with that person?

## B.  H.B. 1327 IS UNCONSTITUTIONAL

10.     As set forth in Plaintiff's Original Complaint and not disputed by the Defendant Attorney General, this Court must test H.B. 1327's constitutionality under the heightened, mid-level scrutiny test as set forth in *Central Hudson Gas & Elec. Corp v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) and subsequent decisions,  generally analyzed as follows:

Is the commercial speech truthful and does it concern lawful activity?   If the answer to both questions is yes, such commercial speech is protected by the First Amendment and any governmental regulation must pass the following three-part test:

(i)      the governmental interest in regulating the commercial speech must be substantial;

(ii)     the  regulation must directly advance the governmental interest asserted; and

(iii)    the regulation must be no more extensive than necessary to serve that substantial governmental interest. (*Central Hudson*, 447 U.S. at 566; *Liquormart v. Rhode Island*, __ U.S. __; 116 S.Ct. 1495; 1996 U.S. LEXIS 3020 (1996)

6

069

11.    The United States Supreme Court has utilized a heightened review, focusing on the "special care" or "special concerns" that arise from blanket bans on a particular type of commercial speech. *Central Hudson*, 447 U.S. at 566, fn 9 & 10; *44 Liquormart*, 1996 U.S. LEXIS at 3031-32. Complete speech bans, unlike content-neutral restrictions on the time, place, or manner of expression are particularly dangerous because they all but foreclose alternative means of disseminating certain information. *44 Liquormart*, 1996 U.S. LEXIS at 3032, 3036 (explaining that any speech prohibition that does not directly advance consumer protection as compared to some other state interest must be reviewed with "special care" and rarely survive constitutional review).

12.    Since the proscribed speech targeted by H.B. 1327 is truthful and not misleading, the party seeking to uphold the restriction on commercial free speech carries the burden of proof justifying the restriction. *Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 1800 (1993). The State carries the further burden that the regulation will not only advance the State interest, "but also that it will do so 'to a material degree.'" *44 Liquormart*, 1996 U.S. LEXIS at 3028, citing *Edenfield*, 507 U.S. at 771.

13.    H.B. 1327 is not a time, place or manner prohibition; but a blanket ban on telephonic or in-person communications by chiropractors to people more likely to need the medical care than the general population.   H.B. 1327 (Section 38.12(a)(3)) proscribes written communications and general advertisements, as well as telephonic or in-person communications.   H.B. 1327 also does not merely require   disclosure of beneficial consumer information, but actually seeks to preclude communications by medical professionals to those most in need of the information.  A State may not constitutionally ban a particular communication on the theory that communicating to those it would most interest is somehow inherently objectionable. *Shapero v. Kentucky Bar Association*, 486 U.S.

7

670

CM-PDF - www.fastio.com

466, 473-74 (1988). H.B. 1327's proscriptions against targeted telephonic and in-person solicitation is squarely aimed at the efficacy of chiropractic solicitation of patients. If political action committees who sponsored H.B. 1327 can force chiropractors to utilize only a shotgun approach, marketing to the general public, as opposed to those most in need of the communication, they can effectively prevent the content of the undesirable communications through rendering the alternatives inefficient and ineffective. See *44 Liquormart*, 1996 U.S. LEXIS at 3026-32,n.8 (explaining that the Court should treat a restriction as a complete ban if it did not "leave open 'satisfactory' alternative channels of communication," citing *Linmark Associates v. Willingbore*, 431 U.S. 85, 92-94 (1977)).

14.    Recognizing the inherent difficulties in applying the Central Hudson test, Justice Thomas has suggested that all attempts to dissuade legal choices by keeping citizens ignorant are impermissible. *44 Liquormart*, 1996 U.S. LEXIS at 3072 (Thomas, J, concurring)

15.    The Supreme Court in *Edenfield v. Fane,* 507 U.S. 761; 113 S. Ct. 1792 (1993) held that unlike rational review basis, when examining Florida's proscription against personal solicitation by CPA'S,

> [W]e must ask whether the state's interests in proscribing it are substantial; whether the challenged regulation advances these interests in a direct and material way; and whether the extent of the restriction on protected speech is in reasonable proportion to the interest served. *Id.* at 1798.

*16. Edenfield* also honored the underlying proposition that "[s]olicitation is a recognized form of speech protected by the First Amendment." *Id.* at 1797. Moreover, *Edenfield* recognized that not only does the seller have the right to solicit business but that receipt of such information by potential buyers provides significant societal benefits. *Id.* at 1798. The First Amendment is designed to safeguard broad access to complete and accurate commercial information which is necessary to

8

a free market economy. *Id.* at 1798.

17.     Like Florida's CPA's, H.B. 1327 seeks to prohibit Texas medical license holders  from disseminating truthful information to those most likely to respond to the information.  As such, it violates Plaintiffs' First Amendment right to free speech and unconstitutionally denies the prospective clients their concomitant right to receive complete and accurate commercial information which is indispensable to making informed decisions within the free market economy. See *44 Liquormart*, 1996 U.S. LEXIS at 3024. Limiting  information as to various medical treatments available and their corresponding prices is likely to harm, not protect, the general public.

18.     Plaintiffs submit that H.B.1327 falls so far short of meeting the appropriate *Central Hudson* test, that this Court may declare H.B. 1327 unconstitutional without an evidentiary hearing. Generally speaking, however, the defendant who seeks to proscribe truthful communications has the burden of coming forward with evidence and creating a record that meets the  *Central Hudson* test. Plaintiffs object to any hearsay or other form of less than credible evidence without Plaintiff's full opportunity to cross examine the proponent of each such piece of evidence.  At this point Plaintiffs can hardly criticize the Defendant's evidence in support of the  *Central Hudson* test, since Plaintiffs have not seen any such evidence and doubt  that very much credible evidence exists that supports this particular statute.

19.     Finally,  upon information and belief,   Plaintiffs would submit that H.B. 1327's sponsor, Senator Drew Nixon, is apparently serving jail time  for solicitation of prostitution at about the same time that H.B. 1327 was being passed by the Texas Legislature.   Defendant in this case has suggested the possibility that affidavits from sponsoring legislators might be more efficient than live testimony under the circumstances.  Plaintiffs would respectfully object to any such hearsay, and

072

believe that Plaintiffs are entitled to full cross examination of all issues material to the factors as set forth in *Central Hudson*.

### C. CRIMINALIZATION OF TRUTHFUL COMMUNICATIONS THROUGH H.B.1327'S VAGUE, CONFUSING AND OVERBROAD PROSCRIPTIONS IS UNCONSTITUTIONAL

20.     A Statute is void for vagueness in violation of a person's Due Process rights secured by the Fourteenth Amendment if "it fails to give a person of ordinary intelligence fair notice that his forbidden conduct is prohibited by the Statute." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). A well recognized body of case law insists " that the law give fair notice of the offending conduct." *Id.* at 162 (citations omitted). Case law has embraced the void for vagueness standard and required that a statute "must be sufficiently definite in that its terms and provisions may be known and understood; otherwise, it is vague and unenforceable." *Lucario v. Texas,* 677 S.W. 2d 693, 696-97 (Tex. App.--Houston [lst Dist.] 1984, no writ), citing *Parr v. State,* 575 S.W. 2d 522 (Tex. Crim. App. 1979).

21.     Justice Holmes has often been credited with advancing this concept of "fair warning" by requiring that the common world understand what the law intends to do if a certain line is passed. *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964), quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)(embracing the fundamental principle "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.").

22.     H.B. 1327 contains vagaries in a somewhat unusual sense of the word: Only by judicial modification of the literal proscriptions of H.B. 1327 can this enactment make any sense whatsoever. In other words, it cannot mean what is says; so the enforcement agencies and perhaps

10

working with or on behalf of such professional should risk committing an offense of H.B. 1327 and suffering the attendant third degree felony penalties. Plaintiffs named in this suit are aware of H.B. 1327 and have suffered significant financial loss because of their compliance with the terms of H.B. 1327. Nonetheless, many similarly situated professionals have dismissed H.B.1327's literal proscriptions as so onerous and obviously overbroad that they have ignored this criminal statute. Thus, Plaintiffs are in the precarious position of avoiding a violation of H.B.1327, while others less familiar with the statute are simply assuming the absence of enforcement. This attitude generates disrespect for our legal system, and dilutes society's moral conscience for obeying the law.

26.    Further, Plaintiffs ask this Court to take notice of the fact that H.B. 1327 does not provide the opportunity for Plaintiffs and or their clients to test the interpretation of H.B. 1327 by application for a permit or similar device; instead, Plaintiffs and those similarly situated must either cease the proscribed communications or risk an interpretation that such conduct creates a felony offense.

27.    Plaintiffs request that the Court declare H.B. 1327 to be unconstitutional and issue a permanent injunction against its enforcement, that Plaintiffs be awarded reasonable attorney's fees pursuant to 42 U.S.C. 1983 and 1988, costs and such other and further relief as Plaintiffs may show themselves justly entitled.

Respectfully submitted,

By: _____

MARTYN B. HILL
State Bar No. 09647460
KENT J. PAGEL
State Bar No. 15410900
3150 Two Houston Center
909 Fannin
Houston, Texas 77010
Tel:   (713)   951-0160

12

Fax:    (713)  951-0662

ATTORNEYS IN CHARGE FOR PLAINTIFFS,
MARK BAILEY,D.C., TODD BOYD,D.C.,
ALEJANDRO LEAL, d/b/a XCLUSIVE HAIR
DESIGNS and ROSA CARTRIGHT, d/b/a RITA'S
BEAUTY SALON

OF COUNSEL:

PAGEL, DAVIS & HILL, P.C.
3150 Two Houston Center
909 Fannin
Houston, Texas 77010
Tel:    (713) 951-1060
Fax:    (713) 951-0662

COMPLAINT.2.vcl\TEXAS

076

the judiciary will be inclined to read exceptions into the statute, or add restrictions that are not contained within the literal terms of the statute.

23. These ad hoc modifications, however, will lead to discriminate enforcement tied to an enforcment agency's disapproval of the content of the message and/or disapproval of the person or entity making the communication. Absence of clear statutory language encourages an arbitrary and discriminatory enforcement of the law. *Papachristou,* 405 U.S. at 170. In a case somewhat similar to the instant case, the Supreme Court held that "a law permitting communication in a certain manner for some but not for others raises the danger of content and viewpoint censorship, which is at its zenith when the determination of who may speak and who may not is left to an official's unbridled discretion." *City of Lakewood v. Plain Dealer Publishing,* 486 U.S. 750, 7-51 (1988). Thus, *Lakewood* suggests that H.B. 1327 places too much discretion in the hands of the local law enforcement agencies and is unconstitutionally vague. Clear Supreme Court precedent has invalidated statutes that are vague and allow unfettered discretion. H.B. 1327 violates the First Amendment and Due Process and Equal Protection provisions of the Fourteenth Amendment.

24. A very recent case shedding light on the criminalization of certain kinds of communication is found at *Janet Reno, et al v. American Civil Liberties Union,* et al, 117 S.Ct.2329 (Decided June 26, 1997)(courtesy copy attached to brief). Because of a criminal statute's "increased deterrent effect, coupled with the 'risk of discriminatory enforcement' of vague regulations, [a criminal statute] poses greater First Amendment concerns than those implicated by [merely] civil regulation." *Reno,* 117 S.Ct. 2329 (Lexis P.49); See e.g. *Dombrowski v. Pfister,* 380 U.S. 479, 494, 85 S.Ct. 1116 (1965); *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1048-51, 111 S.Ct. 2720 (1991).

25. Because of the vagaries involved, no prudent medical professional or other person

11

074

Document ID: C:\LEX40\DOWNLOAD\HB1327ZZ

JANET RENO, ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,
APPELLANTS v. AMERICAN CIVIL LIBERTIES UNION ET AL.

No. 96-511

SUPREME COURT OF THE UNITED STATES

117 S. Ct. 2329; 1997 U.S. LEXIS 4037; 138 L. Ed. 2d 874; 65
U.S.L.W. 4715; 25 Media L. Rep. 1833; 97 Cal. Daily Op.

Service 4998; 97 Daily Journal DAR 8133; 11 Fla. Law W. Fed.

S 211

March 19, 1997, Argued
June 26, 1997, Decided

NOTICE:   [*1]
The LEXIS pagination of this document is subject to change pending
release of the final published version.

PRIOR HISTORY: ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA, Reported at: 1996 U.S. Dist. LEXIS
7919.

DISPOSITION: 929 F. Supp. 824, affirmed.

SYLLABUS:
Two provisions of the Communications Decency Act of 1996 (CDA or Act)
seek to protect minors from harmful material on the Internet, an
international network of interconnected computers that enables millions
of people to communicate with one another in "cyberspace" and to access
vast amounts of information from around the world. Title 47 U.S.C. A. @
223(a)(1)(B)(ii) (Supp. 1997) criminalizes the "knowing" transmission of
"obscene or indecent" messages to any recipient under 18 years of age.
Section 223(d) prohibits the "knowing" sending or displaying to a person
under 18 of any message "that, in context, depicts or describes, in
terms patently offensive as measured by contemporary community [*2]
standards, sexual or excretory activities or organs." Affirmative
defenses are provided for those who take "good faith, . . . effective .
. . actions" to restrict access by minors to the prohibited
communications, @ 223(e)(5)(A), and those who restrict such access by
requiring certain designated forms of age proof, such as a verified
credit card or an adult identification number, @ 223(e)(5)(B). A number
of plaintiffs filed suit challenging the constitutionality of @@
223(a)(1) and 223(d). After making extensive findings of fact, a three-
judge District Court convened pursuant to the Act entered a preliminary
injunction against enforcement of both challenged provisions. The
court's judgment enjoins the Government from enforcing @ 223(a)(1)(B)'s
prohibitions insofar as they relate to "indecent" communications, but
expressly preserves the Government's right to investigate and prosecute
the obscenity or child pornography activities prohibited therein. The
injunction against enforcement of @ 223(d) is unqualified because that
section contains no separate reference to obscenity or child
pornography. The Government appealed to this Court under the Act's

CVirPDF - www.tevlio.com

special review provisions, arguing  [*3]   that the District Court erred in holding that the CDA violated both the First Amendment because it is overbroad and the Fifth Amendment because it is vague.

Held: The CDA's "indecent transmission" and "patently offensive display" provisions abridge "the freedom of speech" protected by the First Amendment. Pp. 17-40.

(a) Although the CDA's vagueness is relevant to the First Amendment overbreadth inquiry, the judgment should be affirmed without reaching the Fifth Amendment issue. P. 17.

(b) A close look at the precedents relied on by the Government-- Ginsberg v. New York, 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274; FCC v. Pacifica Foundation, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026; and Renton v. Playtime Theatres, Inc., 475 U.S. 41, 89 L. Ed. 2d 29, 106 S: Ct. 925--raises, rather than relieves, doubts about the CDA's constitutionality. The CDA differs from the various laws and orders upheld in those cases in many ways, including that it does not allow parents to consent to their children's use of restricted materials; is not limited to commercial transactions; fails to provide any definition of "indecent" and omits any requirement that "patently offensive" material lack socially redeeming value; neither limits its broad categorical [*4]    prohibitions to particular times nor bases them on an evaluation by an agency familiar with the medium's unique characteristics; is punitive; applies to a medium that, unlike radio, receives full First Amendment protection; and cannot be properly analyzed as a form of time, place, and manner regulation because it is a content-based blanket restriction on speech. These precedents, then, do not require the Court to uphold the CDA and are fully consistent with the application of the most stringent review of its provisions. Pp. 17- 21.

(c) The special factors recognized in some of the Court's cases as justifying regulation of the broadcast media--the history of extensive government regulation of broadcasting, see, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 399-400, 23 L. Ed. 2d 371, 89 S. Ct. 1794; the scarcity of available frequencies at its inception, see, e.g., Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 637-638, 129 L. Ed. 2d 497, 114 S. Ct. 2445; and its "invasive" nature, see Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 128, 106 L. Ed. 2d 93, 109 S. Ct. 2829--are not present in cyberspace. Thus, these cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to the Internet. Pp.   [*5]   22-24.

(d) Regardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for First Amendment purposes. For instance, its use of the undefined terms "indecent" and "patently offensive" will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean. The vagueness of such a content-based regulation, see, e.g., Gentile v. State Bar of Nev., 501 U.S. 1030, 115 L. Ed. 2d 888, 111 S. Ct. 2720, coupled with its increased deterrent effect as a criminal statute, see, e.g., Dombrowski v. Pfister, 380 U.S. 479, 14 L. Ed. 2d 22, 85 S. Ct. 1116, raise special First Amendment concerns because of its obvious chilling effect on free speech. Contrary to the Government's argument, the CDA is not saved from vagueness by the fact that its "patently offensive"

CMPDF - www.fastio.com

standard repeats the second part of the three-prong obscenity test set
forth in Miller v. California, 413 U.S. 15, 24, 37 L. Ed. 2d 419, 93 S.
Ct. 2607. The second Miller prong reduces the inherent vagueness of its
own "patently offensive" term by requiring that the proscribed material
be "specifically defined by the applicable state law." In addition, the
CDA applies  [*6]   only to "sexual conduct," whereas, the CDA
prohibition extends also to "excretory activities" and "organs" of both
a sexual and excretory nature. Each of Miller's other two prongs also
critically limits the uncertain sweep of the obscenity definition. Just
because a definition including three limitations is not vague, it does
not follow that one of those limitations, standing alone, is not vague.
The CDA's vagueness undermines the likelihood that it has been carefully
tailored to the congressional goal of protecting minors from potentially
harmful materials. Pp. 24-28.

   (e) The CDA lacks the precision that the First Amendment requires
when a statute regulates the content of speech. Although the Government
has an interest in protecting children from potentially harmful
materials, see, e.g., Ginsberg, 390 U.S. at 639, the CDA pursues that
interest by suppressing a large amount of speech that adults have a
constitutional right to send and receive, see, e.g., Sable, supra, at
126. Its breadth is wholly unprecedented. The CDA's burden on adult
speech is unacceptable if less restrictive alternatives would be at
least as effective in achieving the Act's legitimate purposes.   [*7]
See, e.g., Sable, 492 U.S. at 126. The Government has not proved
otherwise. On the other hand, the District Court found that currently
available user-based software suggests that a reasonably effective
method by which parents can prevent their children from accessing
material which the parents believe is inappropriate will soon be widely
available. Moreover, the arguments in this Court referred to possible
alternatives such as requiring that indecent material be "tagged" to
facilitate parental control, making exceptions for messages with
artistic or educational value, providing some tolerance for parental
choice, and regulating some portions of the Internet differently than
others. Particularly in the light of the absence of any detailed
congressional findings, or even hearings addressing the CDA's special
problems, the Court is persuaded that the CDA is not narrowly tailored.
Pp. 28-33.

   (f) The Government's three additional arguments for sustaining the
CDA's affirmative prohibitions are rejected. First, the contention that
the Act is constitutional because it leaves open ample "alternative
channels" of communication is unpersuasive because the CDA regulates
[*8]   speech on the basis of its content, so that a "time, place, and
manner" analysis is inapplicable. See, e.g., Consolidated Edison Co. of
N. Y. v. Public Serv. Comm'n of N. Y., 447 U.S. 530, 536, 65 L. Ed. 2d
319, 100 S. Ct. 2326. Second, the assertion that the CDA's "knowledge"
and "specific person" requirements significantly restrict its
permissible application to communications to persons the sender knows to
be under 18 is untenable, given that most Internet forums are open to
all comers and that even the strongest reading of the "specific person"
requirement would confer broad powers of censorship, in the form of a
"heckler's veto," upon any opponent of indecent speech. Finally, there
is no textual support for the submission that material having
scientific, educational, or other redeeming social value will
necessarily fall outside the CDA's prohibitions. Pp. 33-35.

   (g) The @ 223(e)(5) defenses do not constitute the sort of "narrow
tailoring" that would save the CDA. The Government's argument that

transmitters may take protective "good faith action" by "tagging" their indecent communications in a way that would indicate their contents, thus permitting recipients to block their reception with appropriate [*9] software, is illusory, given the requirement that such action be "effective": The proposed screening software does not currently exist, but, even if it did, there would be no way of knowing whether a potential recipient would actually block the encoded material. The Government also failed to prove that @ 223(b)(5)'s verification defense would significantly reduce the CDA's heavy burden on adult speech. Although such verification is actually being used by some commercial providers of sexually explicit material, the District Court's findings indicate that it is not economically feasible for most noncommercial speakers. Pp. 35-37.

(h) The Government's argument that this Court should preserve the CDA's constitutionality by honoring its severability clause, @ 608, and by construing nonseverable terms narrowly, is acceptable in only one respect. Because obscene speech may be banned totally, see Miller, supra, at 18, and @ 223(a)'s restriction of "obscene" material enjoys a textual manifestation separate from that for "indecent" material, the Court can sever the term "or indecent" from the statute, leaving the rest of @ 223(a) standing. Pp. 37-39.

(i) The Government's argument [*10] that its "significant" interest in fostering the Internet's growth provides an independent basis for upholding the CDA's constitutionality is singularly unpersuasive. The dramatic expansion of this new forum contradicts the factual basis underlying this contention: that the unregulated availability of "indecent" and "patently offensive" material is driving people away from the Internet. P. 40.

929 F. Supp. 824, affirmed.

COUNSEL: Seth P. Waxman argued the cause for appellants.

Bruce J. Ennis argued the cause for appellees.

JUDGES: STEVENS, J., delivered the opinion of the Court, in which SCALIA, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which REHNQUIST, C. J., joined.

OPINIONBY: STEVENS

OPINION: JUSTICE STEVENS delivered the opinion of the Court.

At issue is the constitutionality of two statutory provisions enacted to protect minors from "indecent" and "patently offensive" communications on the Internet. Notwithstanding the legitimacy and importance of the congressional goal of protecting children from harmful materials, we agree with the three-judge District Court that the statute abridges "the freedom of speech" protected by the First Amendment. n1

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 "Congress shall make no law . . . abridging the freedom of speech." U.S. Const., Amdt. 1.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

CSXPDF - www.texnx.com

- - - - [*11]

    I

    The District Court made extensive findings of fact, most of which were based on a detailed stipulation prepared by the parties. See 929 F. Supp. 824, 830-849 (ED Pa. 1996). n2 The findings describe the character and the dimensions of the Internet, the availability of sexually explicit material in that medium, and the problems confronting age verification for recipients of Internet communications. Because those findings provide the underpinnings for the legal issues, we begin with a summary of the undisputed facts.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

    n2 The Court made 410 findings, including 356 paragraphs of the parties' stipulation and 54 findings based on evidence received in open court. See 929 F. Supp. at 830, n.9, 842, n.15.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Internet

    The Internet is an international network of interconnected computers. It is the outgrowth of what began in 1969 as a military program called "ARPANET," n3 which was designed to enable computers operated by the military, defense contractors, and universities conducting defense-related research  [*12]  to communicate with one another by redundant channels even if some portions of the network were damaged in a war. While the ARPANET no longer exists, it provided an example for the development of a number of civilian networks that, eventually linking with each other, now enable tens of millions of people to communicate with one another and to access vast amounts of information from around the world. The Internet is "a unique and wholly new medium of worldwide human communication." n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

    n3 An acronym for the network developed by the Advanced Research Project Agency.

    n4 Id., at 844 (finding 81).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

    The Internet has experienced "extraordinary growth." n5 The number of "host" computers--those that store information and relay communications--increased from about 300 in 1981 to approximately 9,400,000 by the time of the trial in 1996. Roughly 60% of these hosts are located in the United States. About 40 million people used the Internet at the time of trial, a number that is expected to mushroom to 200 million  [*13]  by 1999.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

CAMPDF - www.texica.com

n5 Id., at 831 (finding 3).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -
- - - -

Individuals can obtain access to the Internet from many different sources, generally hosts themselves or entities with a host affiliation. Most colleges and universities provide access for their students and faculty; many corporations provide their employees with access through an office network; many communities and local libraries provide free access; and an increasing number of storefront "computer coffee shops" provide access for a small hourly fee. Several major national "online services" such as America Online, CompuServe, the Microsoft Network, and Prodigy offer access to their own extensive proprietary networks as well as a link to the much larger resources of the Internet. These commercial online services had almost 12 million individual subscribers at the time of trial.

Anyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods. These methods are constantly evolving and difficult to categorize precisely. [*14]  But, as presently constituted, those most relevant to this case are electronic mail ("e-mail"), automatic mailing list services ("mail exploders," sometimes referred to as "listservs"), "newsgroups," "chat rooms," and the "World Wide Web." All of these methods can be used to transmit text; most can transmit sound, pictures, and moving video images. Taken together, these tools constitute a unique medium--known to its users as "cyberspace"--located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet.

E-mail enables an individual to send an electronic message--generally akin to a note or letter--to another individual or to a group of addressees. The message is generally stored electronically, sometimes waiting for the recipient to check her "mailbox" and sometimes making its receipt known through some type of prompt. A mail exploder is a sort of e-mail group. Subscribers can send messages to a common e-mail address, which then forwards the message to the group's other subscribers. Newsgroups also serve groups of regular participants, but these postings may be read by others as well. There are thousands of such groups, each [*15]  serving to foster an exchange of information or opinion on a particular topic running the gamut from, say, the music of Wagner to Balkan politics to AIDS prevention to the Chicago Bulls. About 100,000 new messages are posted every day. In most newsgroups, postings are automatically purged at regular intervals. In addition to posting a message that can be read later, two or more individuals wishing to communicate more immediately can enter a chat room to engage in real-time dialogue--in other words, by typing messages to one another that appear almost immediately on the others' computer screens. The District Court found that at any given time "tens of thousands of users are engaging in conversations on a huge range of subjects." n6 It is "no exaggeration to conclude that the content on the Internet is as diverse as human thought." n7

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - - -

n6 Id., at 835 (finding 27).

CVirPDF - www.fasiia.com

n7 Id., at 842 (finding 74).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

The best known category of communication over the Internet is the World Wide Web, which allows users to search  [*16]   for and retrieve information stored in remote computers, as well as, in some cases, to communicate back to designated sites. In concrete terms, the Web consists of a vast number of documents stored in different computers all over the world. Some of these documents are simply files containing information. However, more elaborate documents, commonly known as Web "pages," are also prevalent. Each has its own address--"rather like a telephone number." n8 Web pages frequently contain information and sometimes allow the viewer to communicate with the page's (or "site's") author. They generally also contain "links" to other documents created by that site's author or to other (generally) related sites. Typically, the links are either blue or underlined text--sometimes images.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n8 Id., at 836 (finding 36).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Navigating the Web is relatively straightforward. A user may either type the address of a known page or enter one or more keywords into a commercial "search engine" in an effort to locate sites on a subject of interest.   [*17]   A particular Web page may contain the information sought by the "surfer," or, through its links, it may be an avenue to other documents located anywhere on the Internet. Users generally explore a given Web page, or move to another, by clicking a computer "mouse" on one of the page's icons or links. Access to most Web pages is freely available, but some allow access only to those who have purchased the right from a commercial provider. The Web is thus comparable, from the readers' viewpoint, to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services.

From the publishers' point of view, it constitutes a vast platform from which to address and hear from a world-wide audience of millions of readers, viewers, researchers, and buyers. Any person or organization with a computer connected to the Internet can "publish" information. Publishers include government agencies, educational institutions, commercial entities, advocacy groups, and individuals. n9 Publishers may either make their material available to the entire pool of Internet users, or confine access to a selected group, such as those willing to pay for  [*18]   the privilege. "No single organization controls any membership in the Web, nor is there any centralized point from which individual Web sites or services can be blocked from the Web." n10

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 "Web publishing is simple enough that thousands of individual users and small community organizations are using the Web to publish

CVISPDF - www.lexisa.com

their own personal 'home pages,' the equivalent of individualized
newsletters about the person or organization, which are available to
everyone on the Web." Id., at 837 (finding 42).

   n10 Id., at 838 (finding 46).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - - - -


Sexually Explicit Material
   Sexually explicit material on the Internet includes text, pictures,
and chat and "extends from the modestly titillating to the hardest-
core." n11 These files are created, named, and posted in the same manner
as material that is not sexually explicit, and may be accessed either
deliberately or unintentionally during the course of an imprecise
search. "Once a provider posts its content on the Internet, it cannot
prevent that content  [*19]   from entering any community." n12 Thus,
for example,

"when the UCR/California Museum of Photography posts to its Web site
nudes by Edward Weston and Robert Mapplethorpe to announce that its new
exhibit will travel to Baltimore and New York City, those images are
available not only in Los Angeles, Baltimore, and New York City, but
also in Cincinnati, Mobile, or Beijing--wherever Internet users live.
Similarly, the safer sex instructions that Critical Path posts to its
Web site, written in street language so that the teenage receiver can
understand them, are available not just in Philadelphia, but also in
Provo and Prague." n13


- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

   n11 Id., at 844 (finding 82).

   n12 Ibid. (finding 86).

   n13 Ibid. (finding 85).
- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -


Some of the communications over the Internet that originate in foreign
countries are also sexually explicit. n14  [*20]

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

   n14 Id., at 848 (finding 117).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

CMxPDF - www.tesisx.com

Though such material is widely available, users seldom encounter such content accidentally. "A document's title or a description of the document will usually appear before the document itself . . . and in many cases the user will receive detailed information about a site's content before he or she need take the step to access the document. Almost all sexually explicit images are preceded by warnings as to the content." n15 For that reason, the "odds are slim" that a user would enter a sexually explicit site by accident. n16 Unlike communications received by radio or television, "the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial. A child requires some sophistication and some ability to read to retrieve material and thereby to use the Internet unattended." n17

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 Id:, at 844-845 (finding 88).


n16 Ibid.  [*21]

n17 Id., at 845 (finding 89).

- - - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Systems have been developed to help parents control the material that may be available on a home computer with Internet access. A system may either limit a computer's access to an approved list of sources that have been identified as containing no adult material, it may block designated inappropriate sites, or it may attempt to block messages containing identifiable objectionable features. "Although parental control software currently can screen for certain suggestive words or for known sexually explicit sites, it cannot now screen for sexually explicit images." n18 Nevertheless, the evidence indicates that "a reasonably effective method by which parents can prevent their children from accessing sexually explicit and other material which parents may believe is inappropriate for their children will soon be available." n19

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n18 Id., at 842 (finding 72).

n19 Ibid. (finding 73).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -
- - - - [*22]

Age Verification

The problem of age verification differs for different uses of the Internet. The District Court categorically determined that there "is no effective way to determine the identity or the age of a user who is accessing material through e-mail, mail exploders, newsgroups or chat rooms." n20 The Government offered no evidence that there was a reliable way to screen recipients and participants in such fora for age. Moreover, even if it were technologically feasible to block minors'

085

access to newsgroups and chat rooms containing discussions of art, politics or other subjects that potentially elicit "indecent" or "patently offensive" contributions, it would not be possible to block their access to that material and "still allow them access to the remaining content, even if the overwhelming majority of that content was not indecent." n21

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n20 Id., at 845 (finding 90): "An e-mail address provides no authoritative information about the addressee, who may use an e-mail 'alias' or an anonymous remailer. There is also no universal or reliable listing of e-mail addresses and corresponding names or telephone numbers, and any such listing would be or rapidly become incomplete. For these reasons, there is no reliable way in many instances for a sender to know if the e-mail recipient is an adult or a minor. The difficulty of e-mail age verification is compounded for mail exploders such as listservs, which automatically send information to all e-mail addresses on a sender's list. Government expert Dr. Olsen agreed that no current technology could give a speaker assurance that only adults were listed in a particular mail exploder's mailing list."   [*23]
    n21 Ibid. (finding 93).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

Technology exists by which an operator of a Web site may condition access on the verification of requested information such as a credit card number or an adult password. Credit card verification is only feasible, however, either in connection with a commercial transaction in which the card is used, or by payment to a verification agency. Using credit card possession as a surrogate for proof of age would impose costs on non-commercial Web sites that would require many of them to shut down. For that reason, at the time of the trial, credit card verification was "effectively unavailable to a substantial number of Internet content providers." Id., at 846 (finding 102). Moreover, the imposition of such a requirement "would completely bar adults who do not have a credit card and lack the resources to obtain one from accessing any blocked material." n22

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -

n22 Id., at 846 (finding 102).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

Commercial  [*24]   pornographic sites that charge their users for access have assigned them passwords as a method of age verification. The record does not contain any evidence concerning the reliability of these technologies. Even if passwords are effective for commercial purveyors of indecent material, the District Court found that an adult password requirement would impose significant burdens on noncommercial sites, both because they would discourage users from accessing their sites and because the cost of creating and maintaining such screening systems would be "beyond their reach." n23

CSNPDF – www.texlss.com

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

n23 Id., at 847 (findings 104-106):

"At least some, if not almost all, non-commercial organizations, such
as the ACLU, Stop Prisoner Rape or Critical Path AIDS Project, regard
charging listeners to access their speech as contrary to their goals of
making their materials available to a wide audience free of charge.

. . . . .

"There is evidence suggesting that adult users, particularly casual
Web browsers, would be discouraged from retrieving information that
required use of a credit card or password. Andrew Anker testified that
HotWired has received many complaints from its members about HotWired's
registration system, which requires only that a member supply a name, e-
mail address and self-created password. There is concern by commercial
content providers that age verification requirements would decrease
advertising and revenue because advertisers depend on a demonstration
that the sites are widely available and frequently visited."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - - [*25]
In sum, the District Court found:

"Even if credit card verification or adult password verification were
implemented, the Government presented no testimony as to how such
systems could ensure that the user of the password or credit card is in
fact over 18. The burdens imposed by credit card verification and adult
password verification systems make them effectively unavailable to a
substantial number of Internet content providers." Ibid. (finding 107).

II

The Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56,
was an unusually important legislative enactment. As stated on the first
of its 103 pages, its primary purpose was to reduce regulation and
encourage "the rapid deployment of new telecommunications technologies."
The major components of the statute have nothing to do with the
Internet; they were designed to promote competition in the local
telephone service market, the multichannel video market, and the market
for over-the-air broadcasting. The Act includes seven Titles, six of
which are the product of extensive committee hearings and the subject of
discussion in Reports prepared by Committees of the Senate and the House
of Representatives. By contrast, Title [*26] V--known as the
"Communications Decency Act of 1996" (CDA)--contains provisions that
were either added in executive committee after the hearings were
concluded or as amendments offered during floor debate on the
legislation. An amendment offered in the Senate was the source of the
two statutory provisions challenged in this case. n24 They are
informally described as the "indecent transmission" provision and the
"patently offensive display" provision. n25

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - - -

n24 See Exon Amendment No. 1268, 141 Cong. Rec. S8120 (June 9, 1995).
See also id., at S8087. This amendment, as revised, became @ 502 of the

Communications Act of 1996, 110 Stat. 133, 47 U.S.C. A. @@ 223(a)-(e)
(Supp. 1997). Some Members of the House of Representatives opposed the
Exon Amendment because they thought it "possible for our parents now to
child-proof the family computer with these products available in the
private sector." They also thought the Senate's approach would "involve
the Federal Government spending vast sums of money trying to define
elusive terms that are going to lead to a flood of legal challenges
while our kids are unprotected." These Members offered an amendment
intended as a substitute for the Exon Amendment, but instead enacted as
an additional section of the Act entitled "Online Family Empowerment."
See 110 Stat. 137, 47 U.S.C. A. @ 230 (Supp. 1997); 141 Cong. Rec.
H8468-H8472. No hearings were held on the provisions that became law.
See S. Rep. No. 104-23 (1995), p. 9. After the Senate adopted the Exon
amendment, however, its Judiciary Committee did conduct a one-day
hearing on "Cyberporn and Children." In his opening statement at that
hearing, Senator Leahy observed:

   "It really struck me in your opening statement when you mentioned,
Mr. Chairman, that it is the first ever hearing, and you are absolutely
right. And yet we had a major debate on the floor, passed legislation
overwhelmingly on a subject involving the Internet, legislation that
could dramatically change--some would say even wreak havoc--on the
Internet. The Senate went in willy-nilly, passed legislation, and never
once had a hearing, never once had a discussion other than an hour or so
on the floor." Cyberporn and Children: The Scope of the Problem, The
State of the Technology, and the Need for Congressional Action, Hearing
on S. 892 before the Senate Committee on the Judiciary, 104th Cong., 1st
Sess., 7-8 (1995). [*27]

   n25 Although the Government and the dissent break @ 223(d)(1) into
two separate "patently offensive" and "display" provisions, we follow
the convention of both parties below, as well the District Court's order
and opinion, in describing @ 223(d)(1) as one provision.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -
- - - -

   The first, 47 U.S.C. A. @ 223(a) (Supp. 1997), prohibits the knowing
transmission of obscene or indecent messages to any recipient under 18
years of age. It provides in pertinent part:

"(a) Whoever--

"(1) in interstate or foreign communications--

   . . . . .

   "(B) by means of a telecommunications device knowingly--


"(i) makes, creates, or solicits, and


"(ii) initiates the transmission of,

"any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent, knowing that the recipient of the communication is under 18 years of age, regardless of whether the maker of such communication placed the call or initiated the communication;

. . . . . .

    "(2) knowingly permits any telecommunications facility under his control [*28]  to be used for any activity prohibited by paragraph (1) with the intent that it be used for such activity,


"shall be fined under Title 18, or imprisoned not more than two years, or both."

The second provision, @ 223(d), prohibits the knowing sending or displaying of patently offensive messages in a manner that is available to a person under 18 years of age. It provides:

    "(d) Whoever--

"(1) in interstate or foreign communications knowingly--

    "(A) uses an interactive computer service to send to a specific person or persons under 18 years of age, or
    "(B) uses any interactive computer service to display in a manner available to a person under 18 years of age,


"any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs, regardless of whether the user of such service placed the call or initiated the communication; or

    "(2) knowingly permits any telecommunications facility under such person's control to be used for an activity prohibited by paragraph [*29]   (1) with the intent that it be used for such activity,


"shall be fined under Title 18, or imprisoned not more than two years, or both."

The breadth of these prohibitions is qualified by two affirmative defenses. See @ 223(e)(5). n26 One covers those who take "good faith, reasonable, effective, and appropriate actions" to restrict access by minors to the prohibited communications. @ 223(e)(5)(A). The other covers those who restrict access to covered material by requiring certain designated forms of age proof, such as a verified credit card or an adult identification number or code. @ 223(e)(5)(B).

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

    n26 In full, @ 223(e)(5) provides:

"(5) It is a defense to a prosecution under subsection (a)(1)(B) or (d) of this section, or under subsection (a)(2) of this section with respect to the use of a facility for an activity under subsection (a)(1)(B) of this section that a person--

"(A) has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to a communication specified in such subsections, which may involve any appropriate measures to restrict minors from such communications, including any method which is feasible under available technology; or

"(B) has restricted access to such communication by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number."

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - - [*30]

III


On February 8, 1996, immediately after the President signed the statute, 20 plaintiffs n27 filed suit against the Attorney General of the United States and the Department of Justice challenging the constitutionality of @@ 223(a)(1) and 223(d). A week later, based on his conclusion that the term "indecent" was too vague to provide the basis for a criminal prosecution, District Judge Buckwalter entered a temporary restraining order against enforcement of @ 223(a)(1)(B)(ii) insofar as it applies to indecent communications. A second suit was then filed by 27 additional plaintiffs, n28 the two cases were consolidated, and a three-judge District Court was convened pursuant to @ 561 of the Act. n29 After an evidentiary hearing, that Court entered a preliminary injunction against enforcement of both of the challenged provisions. Each of the three judges wrote a separate opinion, but their judgment was unanimous.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

n27 American Civil Liberties Union; Human Rights Watch; Electronic Privacy Information Center; Electronic Frontier Foundation; Journalism Education Association; Computer Professionals for Social Responsibility; National Writers Union; Clarinet Communications Corp.; Institute for Global Communications; Stop Prisoner Rape; AIDS Education Global Information System; Bibliobytes; Queer Resources Directory; Critical Path AIDS Project, Inc.; Wildcat Press, Inc.; Declan McCullagh dba Justice on Campus; Brock Meeks dba Cyberwire Dispatch; John Troyer dba The Safer Sex Page; Jonathan Wallace dba The Ethical Spectacle; and Planned Parenthood Federation of America, Inc.   [*31]

n28 American Library Association; America Online, Inc.; American Booksellers Association, Inc.; American Booksellers Foundation for Free Expression; American Society of Newspaper Editors; Apple Computer, Inc.; Association of American Publishers, Inc.; Association of Publishers, Editors and Writers; Citizens Internet Empowerment Coalition; Commercial Internet Exchange Association; CompuServe Incorporated; Families Against Internet Censorship; Freedom to Read Foundation, Inc.; Health Sciences Libraries Consortium; Hotwired Ventures LLC; Interactive Digital Software Association; Interactive Services Association; Magazine

CIMPDF - www.texiu.com

Publishers of America; Microsoft Corporation; The Microsoft Network, L. L. C.; National Press Photographers Association; Netcom On-Line Communication Services, Inc.; Newspaper Association of America; Opnet, Inc.; Prodigy Services Company; Society of Professional Journalists; Wired Ventures, Ltd.

n29 110 Stat. 142-143, note following 47 U.S.C. A. @ 223 (Supp. 1997).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Chief Judge Sloviter doubted the strength of the Government's interest in regulating "the vast range of online [*32] material covered or potentially covered by the CDA," but acknowledged that the interest was "compelling" with respect to some of that material. 929 F. Supp. at 853. She concluded, nonetheless, that the statute "sweeps more broadly than necessary and thereby chills the expression of adults" and that the terms "patently offensive" and "indecent" were "inherently vague." Id., at 854. She also determined that the affirmative defenses were not "technologically or economically feasible for most providers," specifically considering and rejecting an argument that providers could avoid liability by "tagging" their material in a manner that would allow potential readers to screen out unwanted transmissions. Id., at 856. Chief Judge Sloviter also rejected the Government's suggestion that the scope of the statute could be narrowed by construing it to apply only to commercial pornographers. Id., at 854-855.

Judge Buckwalter concluded that the word "indecent" in @ 223(a)(1)(B) and the terms "patently offensive" and "in context" in @ 223(d)(1) were so vague that criminal enforcement of either section would violate the "fundamental constitutional principle" of "simple fairness," [*33] id., at 861, and the specific protections of the First and Fifth Amendments, id., at 858. He found no statutory basis for the Government's argument that the challenged provisions would be applied only to "pornographic" materials, noting that, unlike obscenity, "indecency has not been defined to exclude works of serious literary, artistic, political or scientific value." Id., at 863. Moreover, the Government's claim that the work must be considered patently offensive "in context" was itself vague because the relevant context might "refer to, among other things, the nature of the communication as a whole, the time of day it was conveyed, the medium used, the identity of the speaker, or whether or not it is accompanied by appropriate warnings." Id., at 864. He believed that the unique nature of the Internet aggravated the vagueness of the statute. Id., at 865, n.9.

Judge Dalzell's review of "the special attributes of Internet communication" disclosed by the evidence convinced him that the First Amendment denies Congress the power to regulate the content of protected speech on the Internet. Id., at 867. His opinion explained at length why he believed the Act [*34] would abridge significant protected speech, particularly by noncommercial speakers, while "perversely, commercial pornographers would remain relatively unaffected." Id., at 879. He construed our cases as requiring a "medium-specific" approach to the analysis of the regulation of mass communication, id., at 873, and concluded that the Internet--as "the most participatory form of mass speech yet developed," id., at 883--is entitled to "the highest protection from governmental intrusion," ibid. n30

CSILPDF - www.fast.com

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - - -

n30 See also 929 F. Supp. at 877: "Four related characteristics of
Internet communication have a transcendent importance to our shared
holding that the CDA is unconstitutional on its face. We explain these
characteristics in our Findings of fact above, and I only rehearse them
briefly here. First, the Internet presents very low barriers to entry.
Second, these barriers to entry are identical for both speakers and
listeners. Third, as a result of these low barriers, astoundingly
diverse content is available on the Internet. Fourth, the Internet
provides significant access to all who wish to speak in the medium, and
even creates a relative parity among speakers." According to Judge
Dalzell, these characteristics and the rest of the District Court's
findings "lead to the conclusion that Congress may not regulate
indecency on the Internet at all." Ibid. Because appellees do not press
this argument before this Court, we do not consider it. Appellees also
do not dispute that the Government generally has a compelling interest
in protecting minors from "indecent" and "patently offensive" speech.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -
- - - - [*35]

The judgment of the District Court enjoins the Government from
enforcing the prohibitions in @ 223(a)(1)(B) insofar as they relate to
"indecent" communications, but expressly preserves the Government's
right to investigate and prosecute the obscenity or child pornography
activities prohibited therein. The injunction against enforcement of @@
223(d)(1) and (2) is unqualified because those provisions contain no
separate reference to obscenity or child pornography.

The Government appealed under the Act's special review provisions, @
561, 110 Stat. 142-143, and we noted probable jurisdiction, see 519 U.S.
(1996). In its appeal, the Government argues that the District Court
erred in holding that the CDA violated both the First Amendment because
it is overbroad and the Fifth Amendment because it is vague. While we
discuss the vagueness of the CDA because of its relevance to the First
Amendment overbreadth inquiry, we conclude that the judgment should be
affirmed without reaching the Fifth Amendment issue. We begin our
analysis by reviewing the principal authorities on which the Government
relies. Then, after describing the overbreadth of the CDA, we consider
the Government's specific  [*36]  contentions, including its submission
that we save portions of the statute either by severance or by
fashioning judicial limitations on the scope of its coverage.

IV

In arguing for reversal, the Government contends that the CDA is
plainly constitutional under three of our prior decisions: (1) Ginsberg
v. New York, 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968); (2)
FCC v. Pacifica Foundation, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct.
3026 (1978); and (3) Renton v. Playtime Theatres, Inc., 475 U.S. 41, 89
L. Ed. 2d 29, 106 S. Ct. 925 (1986). A close look at these cases,
however, raises--rather than relieves--doubts concerning the
constitutionality of the CDA.

In Ginsberg, we upheld the constitutionality of a New York statute
that prohibited selling to minors under 17 years of age material that

092

was considered obscene as to them even if not obscene as to adults. We
rejected the defendant's broad submission that "the scope of the
constitutional freedom of expression secured to a citizen to read or see
material concerned with sex cannot be made to depend on whether the
citizen is an adult or a minor." 390 U.S. at 636. In rejecting that
contention, we relied not only on the State's independent interest in
the well-being of its youth, but also on  [*37]   our consistent
recognition of the principle that "the parents' claim to authority in
their own household to direct the rearing of their children is basic in
the structure of our society." n31 In four important respects, the
statute upheld in Ginsberg was narrower than the CDA. First, we noted in
Ginsberg that "the prohibition against sales to minors does not bar
parents who so desire from purchasing the magazines for their children."
Id., at 639. Under the CDA, by contrast, neither the parents' consent--
nor even their participation--in the communication would avoid the
application of the statute. n32 Second, the New York statute applied
only to commercial transactions, id., at 647, whereas the CDA contains
no such limitation. Third, the New York statute cabined its definition
of material that is harmful to minors with the requirement that it be
"utterly without redeeming social importance for minors." Id., at 646.
The CDA fails to provide us with any definition of the term "indecent"
as used in @ 223(a)(1) and, importantly, omits any requirement that the
"patently offensive" material covered by @ 223(d) lack serious literary,
artistic, political, or scientific  [*38]   value. Fourth, the New York
statute defined a minor as a person under the age of 17, whereas the
CDA, in applying to all those under 18 years, includes an additional
year of those nearest majority.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

    n31 390 U.S. at 639. We quoted from Prince v. Massachusetts, 321 U.S.
158, 166, 88 L. Ed. 645, 64 S. Ct. 438 (1944): "It is cardinal with us
that the custody, care and nurture of the child reside first in the
parents, whose primary function and freedom include preparation for
obligations the state can neither supply nor hinder."

    n32 Given the likelihood that many E-mail transmissions from an adult
to a minor are conversations between family members, it is therefore
incorrect for the dissent to suggest that the provisions of the CDA,
even in this narrow area, "are no different from the law we sustained in
Ginsberg." Post, at 8.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

    In Pacifica, we upheld a declaratory order of the Federal
Communications Commission, holding that the broadcast of a recording of
a 12-minute monologue entitled "Filthy Words" that had previously  [*39]
been delivered to a live audience "could have been the subject of
administrative sanctions." 438 U.S. at 730 (internal quotations
omitted). The Commission had found that the repetitive use of certain
words referring to excretory or sexual activities or organs "in an
afternoon broadcast when children are in the audience was patently
offensive" and concluded that the monologue was indecent "as broadcast."
Id., at 735. The respondent did not quarrel with the finding that the
afternoon broadcast was patently offensive, but contended that it was
not "indecent" within the meaning of the relevant statutes because it
contained no prurient appeal. After rejecting respondent's statutory

arguments, we confronted its two constitutional arguments: (1) that the Commission's construction of its authority to ban indecent speech was so broad that its order had to be set aside even if the broadcast at issue was unprotected; and (2) that since the recording was not obscene, the First Amendment forbade any abridgement of the right to broadcast it on the radio.

In the portion of the lead opinion not joined by Justices Powell and Blackmun, the plurality stated that the First Amendment does not prohibit [*40]  all governmental regulation that depends on the content of speech. Id., at 742-743. Accordingly, the availability of constitutional protection for a vulgar and offensive monologue that was not obscene depended on the context of the broadcast. Id., at 744-748. Relying on the premise that "of all forms of communication" broadcasting had received the most limited First Amendment protection, id., at 748-749, the Court concluded that the ease with which children may obtain access to broadcasts, "coupled with the concerns recognized in Ginsberg," justified special treatment of indecent broadcasting. Id., at 749-750.

As with the New York statute at issue in Ginsberg, there are significant differences between the order upheld in Pacifica and the CDA. First, the order in Pacifica, issued by an agency that had been regulating radio stations for decades, targeted a specific broadcast that represented a rather dramatic departure from traditional program content in order to designate when--rather than whether--it would be permissible to air such a program in that particular medium. The CDA's broad categorical prohibitions are not limited to particular times and [*41]  are not dependent on any evaluation by an agency familiar with the unique characteristics of the Internet. Second, unlike the CDA, the Commission's declaratory order was not punitive; we expressly refused to decide whether the indecent broadcast "would justify a criminal prosecution." Id., at 750. Finally, the Commission's order applied to a medium which as a matter of history had "received the most limited First Amendment protection," id., at 748, in large part because warnings could not adequately protect the listener from unexpected program content. The Internet, however, has no comparable history. Moreover, the District Court found that the risk of encountering indecent material by accident is remote because a series of affirmative steps is required to access specific material.

In Renton, we upheld a zoning ordinance that kept adult movie theatres out of residential neighborhoods. The ordinance was aimed, not at the content of the films shown in the theaters, but rather at the "secondary effects"--such as crime and deteriorating property values--that these theaters fostered: "'It is the secondary effect which these zoning ordinances attempt to avoid, not the dissemination [*42]  of "offensive" speech.'" 475 U.S. at 49 (quoting Young v. American Mini Theatres, Inc., 427 U.S. 50, 71, n.34, 49 L. Ed. 2d 310, 96 S. Ct. 2440 (1976)). According to the Government, the CDA is constitutional because it constitutes a sort of "cyberzoning" on the Internet. But the CDA applies broadly to the entire universe of cyberspace. And the purpose of the CDA is to protect children from the primary effects of "indecent" and "patently offensive" speech, rather than any "secondary" effect of such speech. Thus, the CDA is a content-based blanket restriction on speech, and, as such, cannot be "properly analyzed as a form of time, place, and manner regulation." 475 U.S. at 46. See also Boos v. Barry, 485 U.S. 312, 321, 99 L. Ed. 2d 333, 108 S. Ct. 1157 (1988) ("Regulations that focus on the direct impact of speech on its audience"

are not properly analyzed under Renton); Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 120 L. Ed. 2d 101, 112 S. Ct. 2395 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation").

These precedents, then, surely do not require us to uphold the CDA and are fully consistent with the application of the most stringent review of its provisions.

    V  [*43]

    In Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 557, 43 L. Ed. 2d 448, 95 S. Ct. 1239 (1975), we observed that "each medium of expression . . . may present its own problems." Thus, some of our cases have recognized special justifications for regulation of the broadcast media that are not applicable to other speakers, see Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 23 L. Ed. 2d 371, 89 S. Ct. 1794 (1969); FCC v. Pacifica Foundation, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978). In these cases, the Court relied on the history of extensive government regulation of the broadcast medium, see, e.g., Red Lion, 395 U.S. at 399-400; the scarcity of available frequencies at its inception, see, e.g., Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 637-638, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994); and its "invasive" nature, see Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 128, 106 L. Ed. 2d 93, 109 S. Ct. 2829 (1989).

    Those factors are not present in cyberspace. Neither before nor after the enactment of the CDA have the vast democratic fora of the Internet been subject to the type of government supervision and regulation that has attended the broadcast industry. n33 Moreover, the Internet is not as "invasive" as radio or television. The District Court specifically found that "communications over the Internet  [*44]  do not 'invade' an individual's home or appear on one's computer screen unbidden. Users seldom encounter content 'by accident.'" 929 F. Supp. at 844 (finding 88). It also found that "almost all sexually explicit images are preceded by warnings as to the content," and cited testimony that "'odds are slim' that a user would come across a sexually explicit sight by accident." Ibid.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

    n33 Cf. Pacifica Foundation v. FCC, 181 U.S. App. D.C. 132, 556 F.2d 9, 36 (CADC 1977) (Leventhal, J., dissenting), rev'd, FCC v. Pacifica Foundation, 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978). When Pacifica was decided, given that radio stations were allowed to operate only pursuant to federal license, and that Congress had enacted legislation prohibiting licensees from broadcasting indecent speech, there was a risk that members of the radio audience might infer some sort of official or societal approval of whatever was heard over the radio, see 556 F.2d at 37, n.18. No such risk attends messages received through the Internet, which is not supervised by any federal agency.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - [*45]

    We distinguished Pacifica in Sable, 492 U.S. at 128, on just this

CutePDF - www.cutepdf.com

basis. In Sable, a company engaged in the business of offering sexually oriented prerecorded telephone messages (popularly known as "dial-a-porn") challenged the constitutionality of an amendment to the Communications Act that imposed a blanket prohibition on indecent as well as obscene interstate commercial telephone messages. We held that the statute was constitutional insofar as it applied to obscene messages but invalid as applied to indecent messages. In attempting to justify the complete ban and criminalization of indecent commercial telephone messages, the Government relied on Pacifica, arguing that the ban was necessary to prevent children from gaining access to such messages. We agreed that "there is a compelling interest in protecting the physical and psychological well-being of minors" which extended to shielding them from indecent messages that are not obscene by adult standards, 492 U.S. at 126, but distinguished our "emphatically narrow holding" in Pacifica because it did not involve a complete ban and because it involved a different medium of communication, id., at 127. We [*46]  explained that "the dial-it medium requires the listener to take affirmative steps to receive the communication." Id., at 127-128. "Placing a telephone call," we continued, "is not the same as turning on a radio and being taken by surprise by an indecent message." Id., at 128.

Finally, unlike the conditions that prevailed when Congress first authorized regulation of the broadcast spectrum, the Internet can hardly be considered a "scarce" expressive commodity. It provides relatively unlimited, low-cost capacity for communication of all kinds. The Government estimates that "as many as 40 million people use the Internet today, and that figure is expected to grow to 200 million by 1999." n34 This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue. Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content [*47]  on the Internet is as diverse as human thought." 929 F. Supp. at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - - -

    n34 Juris. Statement 3 (citing 929 F. Supp. at 831 (finding 3)).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - - -

    VI

    Regardless of whether the CDA is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render it problematic for purposes of the First Amendment. For instance, each of the two parts of the CDA uses a different linguistic form. The first uses the word "indecent," 47 U.S.C. A. @ 223(a) (Supp. 1997), while the second speaks of material that "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs," @ 223(d). Given the absence of a definition of either term, n35 this difference in language will provoke uncertainty among speakers about how

CSuPDF - www.texis.com

the two standards relate [*48]   to each other n36 and just what they
mean. n37 Could a speaker confidently assume that a serious discussion
about birth control practices, homosexuality, the First Amendment issues
raised by the Appendix to our Pacifica opinion, or the consequences of
prison rape would not violate the CDA? This uncertainty undermines the
likelihood that the CDA has been carefully tailored to the congressional
goal of protecting minors from potentially harmful materials.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

    n35 "Indecent" does not benefit from any textual embellishment at
all. "Patently offensive" is qualified only to the extent that it
involves "sexual or excretory activities or organs" taken "in.context"
'and "measured by contemporary community standards."

    n36 See Gozlon-Peretz v. United States, 498 U.S. 395, 404, 112 L. Ed.
2d 919, 111 S. Ct. 840 (1991) ("Where Congress includes particular
language in one section of a statute but omits it in another section of
the same Act, it is generally presumed that Congress acts intentionally
and purposely in the disparate inclusion and exclusion") (internal
quotation marks omitted).

    n37 The statute does not indicate whether the "patently offensive"
and "indecent" determinations should be made with respect to minors or
the population as a whole. The Government asserts that the appropriate
standard is "what is suitable material for minors." Reply Brief for
Appellants 18, n.13 (citing Ginsberg v. New York, 390 U.S. 629, 633, 20
L. Ed. 2d 195, 88 S. Ct. 1274 (1968)). But the Conferees expressly
rejected amendments that would have imposed such a "harmful to minors"
standard. See S. Conf. Rep. No. 104-230, p. 189 (1996) (S. Conf. Rep.),
142 Cong. Rec. H1145, H1165-1166 (Feb. 1, 1996). The Conferees also
rejected amendments that would have limited the proscribed materials to
those lacking redeeming value. See S. Conf. Rep., at 189, 142 Cong. Rec.
H1165-1166 (Feb. 1, 1996).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - - [*49]

    The vagueness of the CDA is a matter of special concern for two
reasons. First, the CDA is a content-based regulation of speech. The
vagueness of such a regulation raises special First Amendment concerns
because of its obvious chilling effect on free speech. See, e.g.,
Gentile v. State Bar of Nev., 501 U.S. 1030, 1048-1051, 115 L. Ed. 2d
888, 111 S. Ct. 2720 (1991). Second, the CDA is a criminal statute. In
addition to the opprobrium and stigma of a criminal conviction, the CDA
threatens violators with penalties including up to two years in prison
for each act of violation. The severity of criminal sanctions may well
cause speakers to remain silent rather than communicate even arguably
unlawful words, ideas, and images. See, e.g., Dombrowski v. Pfister, 380
U.S. 479, 494, 14 L. Ed. 2d 22, 85 S. Ct. 1116 (1965). As a practical
matter, this increased deterrent effect, coupled with the "risk of
discriminatory enforcement" of vague regulations, poses greater First
Amendment concerns than those implicated by the civil regulation
reviewed in Denver Area Ed. Telecommunications Consortium, Inc. v. FCC,
518 U.S.     (1996).

    The Government argues that the statute is no more vague than the
obscenity standard this Court established [*50]   in Miller v.

n39 413 U.S. at 30 (Determinations of "what appeals to the 'prurient interest' or is 'patently offensive'. . . . are essentially questions of fact, and our Nation is simply too big and too diverse for this Court to reasonably expect that such standards could be articulated for all 50 States in a single formulation, even assuming the prerequisite consensus exists"). The CDA, which implements the "contemporary community standards" language of Miller, thus conflicts with the Conferees' own assertion that the CDA was intended "to establish a uniform national standard of content regulation." S. Conf. Rep., at 191.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -
- - - - [*53]

. In contrast to Miller and our other previous cases, the CDA thus presents a greater threat of censoring speech that, in fact, falls outside the statute's scope. Given the vague contours of the coverage of the statute, it unquestionably silences some speakers whose messages would be entitled to constitutional protection. That danger provides further reason for insisting that the statute not be overly broad. The CDA's burden on protected speech cannot be justified if it could be avoided by a more carefully drafted statute.

VII

We are persuaded that the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech. In order to deny minors access to potentially harmful speech, the CDA effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another. That burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.

In evaluating the free speech rights of adults, we have made it perfectly clear that "sexual expression which is indecent but not obscene is protected [*54]    by the First Amendment." Sable, 492 U.S. at 126. See also Carey v. Population Services Int'l, 431 U.S. 678, 701, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1977) ("Where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression"). Indeed, Pacifica itself admonished that "the fact that society may find speech offensive is not a sufficient reason for suppressing it." 438 U.S. at 745.

It is true that we have repeatedly recognized the governmental interest in protecting children from harmful materials. See Ginsberg, 390 U.S. at 639; Pacifica, 438 U.S. at 749. But that interest does not justify an unnecessarily broad suppression of speech addressed to adults. As we have explained, the Government may not "reduce the adult population . . . to . . . only what is fit for children." Denver, 518 U.S. at     (slip op., at 29) (internal quotation marks omitted) (quoting Sable, 492 U.S. at 128). n40 "Regardless of the strength of the government's interest" in protecting children, "the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." Bolger  [*55]   v. Youngs Drug Products Corp., 463 U.S. 60, 74-75, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983).

- - - - - - - - - - - - - - - - -Footnotes- - - - - .- - - - - - - - -
- - - -
. - . .

n40 Accord, Butler v. Michigan, 352 U.S. 380, 383, 1 L. Ed. 2d 412, 77 S. Ct. 524 (1957) (ban on sale to adults of books deemed harmful to children unconstitutional); Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 128, 106 L. Ed. 2d 93, 109 S. Ct. 2829 (1989) (ban on "dial-a-porn" messages unconstitutional); Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 73, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983) (ban on mailing of unsolicited advertisement for contraceptives unconstitutional).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The District Court was correct to conclude that the CDA effectively resembles the ban on "dial-a-porn" invalidated in Sable. 929 F. Supp. 824, 854. In Sable, 492 U.S. at 129, this Court rejected the argument that we should defer to the congressional judgment that nothing less than a total ban would be effective in preventing enterprising youngsters from gaining access to indecent communications. Sable thus made clear that the mere fact that a statutory regulation of speech was enacted for the important purpose of protecting [*56] children from exposure to sexually explicit material does not foreclose inquiry into its validity. n41 As we pointed out last Term, that inquiry embodies an "over-arching commitment" to make sure that Congress has designed its statute to accomplish its purpose "without imposing an unnecessarily great restriction on speech." Denver, 518 U.S. at    (slip op., at 11).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n41 The lack of legislative attention to the statute at issue in Sable suggests another parallel with this case. Compare 492 U.S. at 129-130 ("Aside from conclusory statements during the debates by proponents of the bill, as well as similar assertions in hearings on a substantially identical bill the year before, . . . the congressional record presented to us contains no evidence as to how effective or ineffective the FCC's most recent regulations were or might prove to be. . . . No Congressman or Senator purported to present a considered judgment with respect to how often or to what extent minors could or would circumvent the rules and have access to dial-a-porn messages") with n.24, supra.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - - - [*57]

In arguing that the CDA does not so diminish adult communication, the Government relies on the incorrect factual premise that prohibiting a transmission whenever it is known that one of its recipients is a minor would not interfere with adult-to-adult communication. The findings of the District Court make clear that this premise is untenable. Given the size of the potential audience for most messages, in the absence of a viable age verification process, the sender must be charged with knowing that one or more minors will likely view it. Knowledge that, for instance, one or more members of a 100-person chat group will be minor--and therefore that it would be a crime to send the group an indecent message--would surely burden communication among adults. n42

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n42 The Government agrees that these provisions are applicable
whenever "a sender transmits a message to more than one recipient,
knowing that at least one of the specific persons receiving the message
is a minor." Opposition to Motion to Affirm and Reply to Juris.
Statement 4-5, n.1.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - - [*58]

   The District Court found that at the time of trial existing
technology did not include any effective method for a sender to prevent
minors from obtaining access to its communications on the Internet
without also denying access to adults. The Court found no effective way
.to determine the age of a user who is accessing material through e-mail,
mail exploders, newsgroups, or chat rooms. 929 F. Supp. at 845 (findings
90-94). As a practical matter, the Court also found that it would be
prohibitively expensive for noncommercial--as well as some commercial--
speakers who have Web sites to verify that their users are adults. Id.,
at 845-848 (findings 95-116). n43 These limitations must inevitably
curtail a significant amount of adult communication on the Internet. By
contrast, the District Court found that "despite its limitations,
currently available user-based software suggests that a reasonably
effective method by which parents can prevent their children from
accessing sexually explicit and other material which parents may believe
is inappropriate for their children will soon be widely available." Id.,
at 842 (finding 73) (emphases added).

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

   n43 The Government asserts that "there is nothing constitutionally
suspect about requiring commercial Web site operators . . . to shoulder
the modest burdens associated with their use." Brief for Appellants 35.
As a matter of fact, however, there is no evidence that a "modest
burden" would be effective.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - - [*59]


   The breadth of the CDA's coverage is wholly unprecedented. Unlike the
regulations upheld in Ginsberg and Pacifica, the scope of the CDA is not
limited to commercial speech or commercial entities. Its open-ended
prohibitions embrace all nonprofit entities and individuals posting
indecent messages or displaying them on their own computers in the
presence of minors. The general, undefined terms "indecent" and
"patently offensive" cover large amounts of nonpornographic material
with serious educational or other value. n44 Moreover, the "community
standards" criterion as applied to the Internet means that any
communication available to a nation-wide audience will be judged by the
standards of the community most likely to be offended by the message.
n45 The regulated subject matter includes any of the seven "dirty words"
used in the Pacifica monologue, the use of which the Government's expert
acknowledged could constitute a felony. See Olsen Test., Tr. Vol. V,
53:16-54:10. It may also extend to discussions about prison rape or safe
sexual practices, artistic images that include nude subjects, and
arguably the card catalogue of the Carnegie Library.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

n44 Transmitting obscenity and child pornography, whether via the
Internet or other means, is already illegal under federal law for both
adults and juveniles. See 18 U.S.C. @@ 1464-1465 (criminalizing
obscenity); @ 2251 (criminalizing child pornography). In fact, when
Congress was considering the CDA, the Government expressed its view that
the law was unnecessary because existing laws already authorized its
ongoing efforts to prosecute obscenity, child pornography, and child
solicitation. See 141 Cong. Rec. S8342 (June 14, 1995) (letter from Kent
Markus, Acting Assistant Attorney General, U.S. Department of Justice,
to Sen. Leahy). [*60]

n45 Citing Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S.
.520, 124 L. Ed. 2d 472, 113 S. Ct. 2217 (1993), among other cases,
appellees offer an additional reason why, in their view, the CDA fails
strict scrutiny. Because so much sexually explicit content originates
overseas, they argue, the CDA cannot be "effective." Brief for Appellees
American Library Association et al. 33-34. This argument raises
difficult issues regarding the intended, as well as the permissible
scope of, extraterritorial application of the CDA. We find it
unnecessary to address those issues to dispose of this case.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

For the purposes of our decision, we need neither accept nor reject
the Government's submission that the First Amendment does not forbid a
blanket prohibition on all "indecent" and "patently offensive" messages
communicated to a 17-year old--no matter how much value the message may
contain and regardless of parental approval. It is at least clear that
the strength of the Government's interest in protecting minors is not
equally strong throughout the coverage of this broad statute. Under the
CDA, a parent allowing her 17-year-old [*61]   to use the family
computer to obtain information on the Internet that she, in her parental
judgment, deems appropriate could face a lengthy prison term. See 47
U.S.C. A. @ 223(a)(2) (Supp. 1997). Similarly, a parent who sent his 17-
year-old college freshman information on birth control via e-mail could
be incarcerated even though neither he, his child, nor anyone in their
home community, found the material "indecent" or "patently offensive,"
if the college town's community thought otherwise.

The breadth of this content-based restriction of speech imposes an
especially heavy burden on the Government to explain why a less
restrictive provision would not be as effective as the CDA. It has not
done so. The arguments in this Court have referred to possible
alternatives such as requiring that indecent material be "tagged" in a
way that facilitates parental control of material coming into their
homes, making exceptions for messages with artistic or educational
value, providing some tolerance for parental choice, and regulating some
portions of the Internet--such as commercial web sites--differently than
others, such as chat rooms. Particularly in the light of the absence of
any detailed [*62] findings by the Congress, or even hearings
addressing the special problems of the CDA, we are persuaded that the
CDA is not narrowly tailored if that requirement has any meaning at all.

VIII

In an attempt to curtail the CDA's facial overbreadth, the Government

CVAPDF - www.texlaw.com

advances three additional arguments for sustaining the Act's affirmative prohibitions: (1) that the CDA is constitutional because it leaves open ample "alternative channels" of communication; (2) that the plain meaning of the Act's "knowledge" and "specific person" requirement significantly restricts its permissible applications; and (3) that the Act's prohibitions are "almost always" limited to material lacking redeeming social value.

The Government first contends that, even though the CDA effectively censors discourse on many of the Internet's modalities--such as chat groups, newsgroups, and mail exploders--it is nonetheless constitutional because it provides a "reasonable opportunity" for speakers to engage in the restricted speech on the World Wide Web. Brief for Appellants 39. This argument is unpersuasive because the CDA regulates speech on the basis of its content. A "time, place, and manner" analysis is therefore inapplicable.   [*63]   See Consolidated Edison Co. of N. Y. v. Public Serv. Comm'n of N. Y., 447 U.S. 530, 536, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980). It is thus immaterial whether such speech would be feasible on the Web (which, as the Government's own expert acknowledged, would cost up to $ 10,000 if the speaker's interests were not accommodated by an existing Web site, not including costs for database management and age verification). The Government's position is equivalent to arguing that a statute could ban leaflets on certain subjects as long as individuals are free to publish books. In invalidating a number of laws that banned leafletting on the streets regardless of their content--we explained that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Schneider v. State (Town of Irvington), 308 U.S. 147, 163, 84 L. Ed. 155, 60 S. Ct. 146 (1939).

The Government also asserts that the "knowledge" requirement of both @@ 223(a) and (d), especially when coupled with the "specific child" element found in @ 223(d), saves the CDA from overbreadth. Because both sections prohibit the dissemination of indecent messages only to persons known to be under   [*64]   18, the Government argues, it does not require transmitters to "refrain from communicating indecent material to adults; they need only refrain from disseminating such materials to persons they know to be under 18." Brief for Appellants 24. This argument ignores the fact that most Internet fora--including chat rooms, newsgroups, mail exploders, and the Web--are open to all comers. The Government's assertion that the knowledge requirement somehow protects the communications of adults is therefore untenable. Even the strongest reading of the "specific person" requirement of @ 223(d) cannot save the statute. It would confer broad powers of censorship, in the form of a "heckler's veto," upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that his 17-year-old child--a "specific person . . . under 18 years of age," 47 U.S.C. A. @ 223(d)(1)(A) (Supp. 1997)--would be present.

Finally, we find no textual support for the Government's submission that material having scientific, educational, or other redeeming social value will necessarily fall outside the CDA's "patently offensive" and "indecent" prohibitions. See also n.37, supra.

    IX

The   [*65]   Government's three remaining arguments focus on the defenses provided in @ 223(e)(5). n46 First, relying on the "good faith, reasonable, effective, and appropriate actions" provision, the

CSADPDF - www.lexis.com

Government suggests that "tagging" provides a defense that saves the
constitutionality of the Act. The suggestion assumes that transmitters
may encode their indecent communications in a way that would indicate
their contents, thus permitting recipients to block their reception with
appropriate software. It is the requirement that the good faith action
must be "effective" that makes this defense illusory. The Government
recognizes that its proposed screening software does not currently
exist. Even if it did, there is no way to know whether a potential
recipient will actually block the encoded material. Without the
impossible knowledge that every guardian in America is screening for the
"tag," the transmitter could not reasonably rely on its action to be
"effective."

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - -'- - - - -
- - - -

    n46 For the full text of @ 223(e)(5), see n.26, supra.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - - [*66]

    For its second and third arguments concerning defenses--which we can
consider together--the Government relies on the latter half of @
223(e)(5), which applies when the transmitter has restricted access by
requiring use of a verified credit card or adult identification. Such
verification is not only technologically available but actually is used
by commercial providers of sexually explicit material. These providers,
therefore, would be protected by the defense. Under the findings of the
District Court, however, it is not economically feasible for most
noncommercial speakers to employ such verification. Accordingly, this
defense would not significantly narrow the statute's burden on
noncommercial speech. Even with respect to the commercial pornographers
that would be protected by the defense, the Government failed to adduce
any evidence that these verification techniques actually preclude minors
from posing as adults. n47 Given that the risk of criminal sanctions
"hovers over each content provider, like the proverbial sword of
Damocles," n48 the District Court correctly refused to rely on unproven
future technology to save the statute. The Government thus failed to
prove that the proffered  [*67]   defense would significantly reduce the
heavy burden on adult speech produced by the prohibition on offensive
displays.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -
- - - -

    n47 Thus, ironically, this defense may significantly protect
commercial purveyors of obscene postings while providing little (or no)
benefit for transmitters of indecent messages that have significant
social or artistic value.

    n48 929 F. Supp. at 855-856.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - -

    We agree with the District Court's conclusion that the CDA places an
unacceptably heavy burden on protected speech, and that the defenses do
not constitute the sort of "narrow tailoring" that will save an
otherwise patently invalid unconstitutional provision. In Sable, 492

CIVPDF - www.fasio.com

U.S. at 127, we remarked that the speech restriction at issue there amounted to "'burning the house to roast the pig.'" The CDA, casting a far darker shadow over free speech, threatens to torch a large segment of the Internet community.

X

At oral argument, the Government relied heavily on its ultimate fall-back position: If this Court should conclude that the   [*68]   CDA is insufficiently tailored, it urged, we should save the statute's constitutionality by honoring the severability clause, see 47 U.S.C. @ 608, and construing nonseverable terms narrowly. In only one respect is this argument acceptable.

A severability clause requires textual provisions that can be severed. We will follow @ 608's guidance by leaving constitutional textual elements of the statute intact in the one place where they are, in fact, severable. The "indecency" provision, 47 U.S.C. A. @ 223(a) (Supp. 1997), applies to "any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent." (Emphasis added.) Appellees do not challenge the application of the statute to obscene speech, which, they acknowledge, can be banned totally because it enjoys no First Amendment protection. See Miller, 413 U.S. at 18. As set forth by the statute, the restriction of "obscene" material enjoys a textual manifestation separate from that for "indecent" material, which we have held unconstitutional. Therefore, we will sever the term "or indecent" from the statute, leaving the rest of @ 223(a) standing. In no other respect, however, can @   [*69]   223(a) or @ 223(d) be saved by such a textual surgery.

The Government also draws on an additional, less traditional aspect of the CDA's severability clause, 47 U.S.C., @ 608, which asks any reviewing court that holds the statute facially unconstitutional not to invalidate the CDA in application to "other persons or circumstances" that might be constitutionally permissible. It further invokes this Court's admonition that, absent "countervailing considerations," a statute should "be declared invalid to the extent it reaches too far, but otherwise left intact." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503-504, 86 L. Ed. 2d 394, 105 S. Ct. 2794 (1985). There are two flaws in this argument.

First, the statute that grants our jurisdiction for this expedited review, 47 U.S.C. A. @ 561 (Supp. 1997), limits that jurisdictional grant to actions challenging the CDA "on its face." Consistent with @ 561, the plaintiffs who brought this suit and the three-judge panel that decided it treated it as a facial challenge. We have no authority, in this particular posture, to convert this litigation into an "as-applied" challenge. Nor, given the vast array of plaintiffs, the range of their expressive activities,   [*70]   and the vagueness of the statute, would it be practicable to limit our holding to a judicially defined set of specific applications.

Second, one of the "countervailing considerations" mentioned in Brockett is present here. In considering a facial challenge, this Court may impose a limiting construction on a statute only if it is "readily susceptible" to such a construction. Virginia v. American Booksellers Assn., Inc., 484 U.S. 383, 397, 98 L. Ed. 2d 782, 108 S. Ct. 636 (1988). See also Erznoznik, v. Jacksonville, 422 U.S. 205, 216, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975) ("readily subject" to narrowing

CutePDF - www.texba.com

construction). The open-ended character of the CDA provides no guidance whatever for limiting its coverage.

This case is therefore unlike those in which we have construed a statute narrowly because the text or other source of congressional intent identified a clear line that this Court could draw. Cf., e.g., Brockett, 472 U.S. at 504-505 (invalidating obscenity statute only to the extent that word "lust" was actually or effectively excised from statute); United States v. Grace, 461 U.S. 171, 180-183, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983) (invalidating federal statute banning expressive displays only insofar as it extended to public sidewalks [*71] when clear line could be drawn between sidewalks and other grounds that comported with congressional purpose of protecting the building, grounds, and people therein). Rather, our decision in United States v. Treasury Employees, 513 U.S. 454, 479, n.26, 130 L. Ed. 2d 964, 115 S. Ct. 1003 (1995), is applicable. In that case, we declined to "draw one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn" because doing so "involves a far more serious invasion of the legislative domain." n49 This Court "will not rewrite a . . . law to conform it to constitutional requirements." American Booksellers, 484 U.S. at 397. n50

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n49 As this Court long ago explained, "It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders and leave it to the courts to step inside and say who could be rightfully be detained and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government." United States v. Reese, 92 U.S. 214, 221, 23 L. Ed. 563 (1876). In part because of these separation of powers concerns, we have held that a severability clause is "an aid merely; not an inexorable command." Dorchy v. Kansas, 264 U.S. 286, 290, 68 L. Ed. 686, 44 S. Ct. 323 (1924).   [*72]

n50 See also Osborne v. Ohio, 495 U.S. 103, 121, 109 L. Ed. 2d 98, 110 S. Ct. 1691 (1990) (judicial rewriting of statutes would derogate Congress's "incentive to draft a narrowly tailored law in the first place").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

XI

In this Court, though not in the District Court, the Government asserts that--in addition to its interest in protecting children--its "equally significant" interest in fostering the growth of the Internet provides an independent basis for upholding the constitutionality of the CDA. Brief for Appellants 19. The Government apparently assumes that the unregulated availability of "indecent" and "patently offensive" material on the Internet is driving countless citizens away from the medium because of the risk of exposing themselves or their children to harmful material.

We find this argument singularly unpersuasive. The dramatic expansion of this new marketplace of ideas contradicts the factual basis of this contention. The record demonstrates that the growth of the Internet has

been and continues to be phenomenal. As a matter of constitutional tradition, in the absence of evidence to the contrary, we presume   [*73] that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it. The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship.

For the foregoing reasons, the judgment of the district court is affirmed.

It is so ordered.

CONCURBY: O'CONNOR (In Part)

DISSENTBY: O'CONNOR (In Part)

DISSENT: JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, concurring in the judgment in part and dissenting in part.

I write separately to explain why I view the Communications Decency Act of 1996 (CDA) as little more than an attempt by Congress to create "adult zones" on the Internet. Our precedent indicates that the creation of such zones can be constitutionally sound. Despite the soundness of its purpose, however, portions of the CDA are unconstitutional because they stray from the blueprint our prior cases have developed for constructing a "zoning law" that passes constitutional muster.

Appellees bring a facial challenge to three provisions of the CDA. The first, which the Court describes as the "indecency transmission" provision, makes it a crime to knowingly transmit   [*74]   an obscene or indecent message or image to a person the sender knows is under 18 years old. 47 U.S.C. A. @ 223(a)(1)(B) (May 1996 Supp.). What the Court classifies as a single "'patently offensive display'" provision, see ante, at 11, is in reality two separate provisions. The first of these makes it a crime to knowingly send a patently offensive message or image to a specific person under the age of 18 ("specific person" provision). @ 223(d)(1)(A). The second criminalizes the display of patently offensive messages or images "in any manner available" to minors ("display" provision). @ 223(d)(1)(B). None of these provisions purports to keep indecent (or patently offensive) material away from adults, who have a First Amendment right to obtain this speech. Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126, 106 L. Ed. 2d 93, 109 S. Ct. 2829 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment"). Thus, the undeniable purpose of the CDA is to segregate indecent material on the Internet into certain areas that minors cannot access. See S. Conf. Rep. No. 104-230, p. 189 (1996) (CDA imposes "access restrictions . . . to protect minors from exposure to indecent   [*75]   material").

The creation of "adult zones" is by no means a novel concept. States have long denied minors access to certain establishments frequented by adults. n1 States have also denied minors access to speech deemed to be "harmful to minors." n2 The Court has previously sustained such zoning laws, but only if they respect the First Amendment rights of adults and minors. That is to say, a zoning law is valid if (i) it does not unduly restrict adult access to the material; and (ii) minors have no First Amendment right to read or view the banned material. As applied to the Internet as it exists in 1997, the "display" provision and some applications of the "indecency transmission" and "specific person"

CSVPDF - www.texiss.com

provisions fail to adhere to the first of these limiting principles by
restricting adults' access to protected materials in certain
circumstances. Unlike the Court, however, I would invalidate the
provisions only in those circumstances.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- - - -

n1 See, e.g., Alaska Stat. Ann. @ 11.66.300 (1996) (no minors in
"adult entertainment" places); Ariz. Rev. Stat. Ann. @ 13-3556 (1989)
(no minors in places where people expose themselves); Ark. Code Ann. @@
5-27-223, 5-27-224 (1993) (no minors in poolrooms and bars); Colo. Rev.
Stat. @ 18-7-502(2) (1986) (no minors in places displaying movies or
.shows that are "harmful to children"); Del. Code Ann., Tit. 11, @
1365(i)(2) (1995) (same); D. C. Code Ann. @ 22-2001(b)(1)(B) (1996)
(same); Fla. Stat. @ 847.013(2) (1994) (same); Ga. Code Ann. @ 16-12-
103(b) (1996) (same); Haw. Rev. Stat. @ 712-1215(1)(b) (1994) (no minors
in movie houses or shows that are "pornographic for minors"); Idaho Code
@ 18-1515(2) (1987) (no minors in places displaying movies or shows that
are "harmful to minors"); La. Rev. Stat. Ann. @ 14:91.11(B) (West 1986)
(no minors in places displaying movies that depict sex acts and appeal
to minors' prurient interest); Md. Ann. Code, Art. 27, @ 416E (1996) (no
minors in establishments where certain enumerated acts are performed or
portrayed); Mich. Comp. Laws @ 750.141 (1991) (no minors without an
adult in places where alcohol is sold); Minn. Stat. @ 617.294 (1987 and
Supp. 1997) (no minors in places displaying movies or shows that are
"harmful to minors"); Miss. Code Ann. @ 97-5-11 (1994) (no minors in
poolrooms, billiard halls, or where alcohol is sold); Mo. Rev. Stat. @
573.507 (1995) (no minors in adult cabarets); Neb. Rev. Stat. @ 28-809
(1995) (no minors in places displaying movies or shows that are "harmful
to minors"); Nev. Rev. Stat. @ 201.265(3) (1997) (same); N. H. Rev.
Stat. Ann. @ 571-B:2(II) (1986) (same); N. M. Stat. Ann. @ 30-37-3
(1989) (same); N. Y. Penal Law @ 235.21(2) (McKinney 1989) (same); N. D.
Cent. Code @ 12.1-27.1-03 (1985 and Supp. 1995) (same); 18 Pa. Cons.
Stat. @ 5903(a) (Supp. 1997) (same); S. D. Comp. Laws Ann. @ 22-24-30
(1988) (same); Tenn. Code Ann. @ 39-17-911(b) (1991) (same); Vt. Stat.
Ann., Tit. 13, @ 2802(b) (1974) (same); Va. Code Ann. @ 18.2-391 (1996)
(same). [*76]

n2 See, e.g., Ala. Code @ 13A-12-200.5 (1994); Ariz. Rev. Stat. Ann.
@ 13-3506 (1989); Ark. Code Ann. 5-68-502 (1993); Cal. Penal Code Ann. @
313.1 (West Supp. 1997); Colo. Rev. Stat. @ 18-7-502(1) (1986); Conn.
Gen. Stat. @ 53a-196 (1994); Del. Code Ann., Tit. 11, @ 1365(i)(1)
(1995); D. C. Code Ann. @ 22-2001(b)(1)(A) (1996); Fla. Stat. @ 847.012
(1994); Ga. Code Ann. @ 16-12-103(a) (1996); Haw. Rev. Stat. @ 712-
1215(1) (1994); Idaho Code @ 18-1515(1) (1987); Ill. Comp. Stat., ch.
720, @ 5/11-21 (1993); Ind. Code @ 35-49-3-3(1) (Supp. 1996); Iowa Code
@ 728.2 (1993); Kan. Stat. Ann. @ 21-4301c(a)(2) (1988); La. Rev. Stat.
Ann. @ 14:91.11(B) (West 1986); Md. Ann. Code, Art. 27, @ 416B (1996);
Mass. Gen. Laws, ch. 272, @ 28 (1992); Minn. Stat. @ 617.293 (1987 and
Supp. 1997); Miss. Code Ann. @ 97-5-11 (1994); Mo. Rev. Stat. @ 573.040
(1995); Mont. Code Ann. @ 45-8-206 (1995); Neb. Rev. Stat. @ 28-808
(1995); Nev. Rev. Stat. @@ 201.265(1), (2) (1997); N. H. Rev. Stat. Ann.
@ 571-B:2(I) (1986); N. M. Stat. Ann. @ 30-37-2 (1989); N. Y. Penal Law
@ 235.21(1) (McKinney 1989); N. C. Gen. Stat. @ 14-190.15(a) (1993); N.
D. Cent. Code @ 12.1-27.1-03 (1985 and Supp. 1995); Ohio Rev. Code Ann.
@ 2907.31(A)(1) (Supp. 1997); Okla. Stat., Tit. 21, @ 1040.76(2) (Supp.
1997); 18 Pa. Cons. Stat. @ 5903(c) (Supp. 1997); R. I. Gen. Laws @ 11-
31-10(a) (1996); S. C. Code Ann. @ 16-15-385(A) (Supp. 1996); S. D.

CoolPDF - www.coolpdf.com

Comp. Laws Ann. @ 22-24-28 (1988); Tenn. Code Ann. @ 39-17-911(a)
(1991); Tex Penal Code Ann. @ 43.24(b) (1994); Utah Code Ann. @ 76-10-
1206(2) (1995); Vt. Stat. Ann., Tit. 13, @ 2802(a) (1974); Va. Code Ann.
@ 18.2-391 (1996); Wash. Rev. Code @ 9.68.060 (1988 and Supp. 1997);
Wis. Stat. @ 948.11(2) (Supp. 1995).

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -
- - - - - [*77]

     I

    Our cases make clear that a "zoning" law is valid only if adults are
still able to obtain the regulated speech. If they cannot, the law does
more than simply keep children away from speech they have no right to
obtain--it interferes with the rights of adults to obtain
constitutionally protected speech and effectively "reduces the adult
population . . . to reading only what is fit for children." Butler v.
Michigan, 352 U.S. 380, 383, 1 L. Ed. 2d 412, 77 S. Ct. 524 (1957). The
First Amendment does not tolerate such interference. See id., at 383
(striking down a Michigan criminal law banning sale of books--to minors
or adults--that contained words or pictures that "'tended to . . .
corrupt the morals of youth'"); Sable Communications, supra
(invalidating federal law that made it a crime to transmit indecent, but
nonobscene, commercial telephone messages to minors and adults); Bolger
v. Youngs Drug Products Corp., 463 U.S. 60, 74, 77 L. Ed. 2d 469, 103 S.
Ct. 2875 (1983) (striking down a federal law prohibiting the mailing of
unsolicited advertisements for contraceptives). If the law does not
unduly restrict adults' access to constitutionally protected speech,
however, it may be valid. In Ginsberg v. New York,  [*78]  390 U.S.
629, 634, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968), for example, the
Court sustained a New York law that barred store owners from selling
pornographic magazines to minors in part because adults could still buy
those magazines.

    The Court in Ginsberg concluded that the New York law created a
constitutionally adequate adult zone simply because, on its face, it
denied access only to minors. The Court did not question--and therefore
necessarily assumed--that an adult zone, once created, would succeed in
preserving adults' access while denying minors' access to the regulated
speech. Before today, there was no reason to question this assumption,
for the Court has previously only considered laws that operated in the
physical world, a world that with two characteristics that make it
possible to create "adult zones": geography and identity. See Lessig,
Reading the Constitution in Cyberspace, 45 Emory L. J. 869, 886 (1996).
A minor can see an adult dance show only if he enters an establishment
that provides such entertainment. And should he attempt to do so, the
minor will not be able to conceal completely his identity (or,
consequently, his age). Thus, the twin characteristics of geography and
identity enable  [*79]  the establishment's proprietor to prevent
children from entering the establishment, but to let adults inside.

    The electronic world is fundamentally different. Because it is no
more than the interconnection of electronic pathways, cyberspace allows
speakers and listeners to mask their identities. Cyberspace undeniably
reflects some form of geography; chat rooms and Web sites, for example,
exist at fixed "locations" on the Internet. Since users can transmit and
receive messages on the Internet without revealing anything about their
identities or ages, see Lessig, supra, at 901, however, it is not
currently possible to exclude persons from accessing certain messages on

CSMPDF - www.texla.com

the basis of their identity.

Cyberspace differs from the physical world in another basic way:
Cyberspace is malleable. Thus, it is possible to construct barriers in
cyberspace and use them to screen for identity, making cyberspace more
like the physical world and, consequently, more amenable to zoning laws.
This transformation of cyberspace is already underway. Lessig, supra, at
888-889. Id., at 887 (cyberspace "is moving . . . from a relatively
unzoned place to a universe that is extraordinarily well zoned").
[*80]    Internet speakers (users who post material on the Internet) have
begun to zone cyberspace itself through the use of "gateway" technology.
Such technology requires Internet users to enter information about
themselves--perhaps an adult identification number or a credit card
.number--before they can access certain areas of cyberspace, 929 F. Supp.
824, 845 (ED Pa. 1996), much like a bouncer checks a person's driver's
license before admitting him to a nightclub. Internet users who access
information have not attempted to zone cyberspace itself, but have tried
to limit their own power to access information in cyberspace, much as a
parent controls what her children watch on television by installing a
lock box. This user-based zoning is accomplished through the use of
screening software (such as Cyber Patrol or SurfWatch) or browsers with
screening capabilities, both of which search addresses and text for
keywords that are associated with "adult" sites and, if the user wishes,
blocks access to such sites. Id., at 839-842. The Platform for Internet
Content Selection (PICS) project is designed to facilitate user-based
zoning by encouraging Internet speakers to rate the content of their
speech [*81]    using codes recognized by all screening programs. Id., at
838-839.

Despite this progress, the transformation of cyberspace is not
complete. Although gateway technology has been available on the World
Wide Web for some time now, id., at 845; Shea v. Reno, 930 F. Supp. 916,
933-934 (SDNY 1996), it is not available to all Web speakers, 929 F.
Supp. at 845-846, and is just now becoming technologically feasible for
chat rooms and USENET newsgroups, Brief for Federal Parties 37-38.
Gateway technology is not ubiquitous in cyberspace, and because without
it "there is no means of age verification," cyberspace still remains
largely unzoned--and unzoneable. 929 F. Supp. at 846; Shea, supra, at
934. User-based zoning is also in its infancy. For it to be effective,
(i) an agreed-upon code (or "tag") would have to exist; (ii) screening
software or browsers with screening capabilities would have to be able
to recognize the "tag"; and (iii) those programs would have to be widely
available--and widely used--by Internet users. At present, none of these
conditions is true. Screening software "is not in wide use today" and
"only a handful of browsers have screening capabilities."    [*82]
Shea, supra, at 945-946. There is, moreover, no agreed-upon "tag" for
those programs to recognize. 929 F. Supp. at 848; Shea, supra, at 945.


Although the prospects for the eventual zoning of the Internet appear
promising, I agree with the Court that we must evaluate the
constitutionality of the CDA as it applies to the Internet as it exists
today. Ante, at 36. Given the present state of cyberspace, I agree with
the Court that the "display" provision cannot pass muster. Until gateway
technology is available throughout cyberspace, and it is not in 1997, a
speaker cannot be reasonably assured that the speech he displays will
reach only adults because it is impossible to confine speech to an
"adult zone." Thus, the only way for a speaker to avoid liability under
the CDA is to refrain completely from using indecent speech. But this

110

forced silence impinges on the First Amendment right of adults to make
and obtain this speech and, for all intents and purposes, "reduces the
adult population [on the Internet] to reading only what is fit for
children." Butler, 352 U.S. at 383. As a result, the "display" provision
cannot withstand scrutiny. Accord, Sable Communications, [*83]   492
U.S. at 126-131; Bolger v. Youngs Drug Products Corp., 463 U.S. at 73-
75.

   The "indecency transmission" and "specific person" provisions present
a closer issue, for they are not unconstitutional in all of their
applications. As discussed above, the "indecency transmission" provision
makes it a crime to transmit knowingly an indecent message to a person
the sender knows is under 18 years of age. 47 U.S.C. A. @ 223(a)(1)(B)
(May 1996 Supp.). The "specific person" provision proscribes the same
conduct, although it does not as explicitly require the sender to know
that the intended recipient of his indecent message is a minor. @
223(d)(1)(A). Appellant urges the Court to construe the provision to
impose such a knowledge requirement, see Brief for Federal Parties 25-
27, and I would do so. See Edward J. DeBartolo Corp. v. Florida Gulf
Coast Building & Constr. Trades Council, 485 U.S. 568, 575, 99 L. Ed. 2d
645, 108 S. Ct. 1392 (1988) ("Where an otherwise acceptable construction
of a statute would raise serious constitutional problems, the Court will
construe the statute to avoid such problems unless such construction is
plainly contrary to the intent of Congress").

   So construed, both provisions  [*84]   are constitutional as applied
to a conversation involving only an adult and one or more minors--e.g.,
when an adult speaker sends an e-mail knowing the addressee is a minor,
or when an adult and minor converse by themselves or with other minors
in a chat room. In this context, these provisions are no different from
the law we sustained in Ginsberg. Restricting what the adult may say to
the minors in no way restricts the adult's ability to communicate with
other adults. He is not prevented from speaking indecently to other
adults in a chat room (because there are no other adults participating
in the conversation) and he remains free to send indecent e-mails to
other adults. The relevant universe contains only one adult, and the
adult in that universe has the power to refrain from using indecent
speech and consequently to keep all such speech within the room in an
"adult" zone.

   The analogy to Ginsberg breaks down, however, when more than one
adult is a party to the conversation. If a minor enters a chat room
otherwise occupied by adults, the CDA effectively requires the adults in
the room to stop using indecent speech. If they did not, they could be
prosecuted under the  [*85]  "indecency transmission" and "specific
person" provisions for any indecent statements they make to the group,
since they would be transmitting an indecent message to specific
persons, one of whom is a minor. Accord, ante, at 30. The CDA is
therefore akin to a law that makes it a crime for a bookstore owner to
sell pornographic magazines to anyone once a minor enters his store.
Even assuming such a law might be constitutional in the physical world
as a reasonable alternative to excluding minors completely from the
store, the absence of any means of excluding minors from chat rooms in
cyberspace restricts the rights of adults to engage in indecent speech
in those rooms. The "indecency transmission" and "specific person"
provisions share this defect.

   But these two provisions do not infringe on adults' speech in all
situations. And as discussed below, I do not find that the provisions

CMPDF - www.teslsc.com

are overbroad in the sense that they restrict minors' access to a
substantial amount of speech that minors have the right to read and
view. Accordingly, the CDA can be applied constitutionally in some
situations. Normally, this fact would require the Court to reject a
direct facial challenge.   [*86]   United States v. Salerno, 481 U.S.
739, 745, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987) ("A facial challenge
to a legislative Act [succeeds only if] the challenger . . . establishes
that no set of circumstances exists under which the Act would be
valid"). Appellees' claim arises under the First Amendment, however, and
they argue that the CDA is facially invalid because it is "substantially
overbroad"--that is, it "sweeps too broadly . . . [and] penalizes a
substantial amount of speech that is constitutionally protected,"
Forsyth County v. Nationalist Movement, 505 U.S. 123, 130, 120 L. Ed. 2d
101, 112 S. Ct. 2395 (1992). See Brief for Appellees American Library
Association et al. 48; Brief for Appellees American Civil Liberties
Union et al. 39-41. I agree with the Court that the provisions are
overbroad in that they cover any and all communications between adults
and minors, regardless of how many adults might be part of the audience
to the communication.

    This conclusion does not end the matter, however. Where, as here,
"the parties challenging the statute are those who desire to engage in
protected speech that the overbroad statute purports to punish . . . the
statute may forthwith be declared invalid to the extent that it reaches
[*87]   too far, but otherwise left intact." Brockett v. Spokane
Arcades, Inc., 472 U.S. 491, 504, 86 L. Ed. 2d 394, 105 S. Ct. 2794
(1985). There is no question that Congress intended to prohibit certain
communications between one adult and one or more minors. See 47 U.S.C.
A. @ 223(a)(1)(B) (May 1996 Supp.) (punishing "whoever . . . initiates
the transmission of [any indecent communication] knowingly that the
recipient of the communication is under 18 years of age"); @
223(d)(1)(A) (punishing "whoever . . . sends to a specific person or
persons under 18 years of age [a patently offensive message]"). There is
also no question that Congress would have enacted a narrower version of
these provisions had it known a broader version would be declared
unconstitutional. 47 U.S.C. @ 608 ("If . . . the application [of any
provision of the CDA] to any person or circumstance is held invalid,
. . . the application of such provision to other persons or
circumstances shall not be affected thereby"). I would therefore sustain
the "indecency transmission" and "specific person" provisions to the
extent they apply to the transmission of Internet communications where
the party initiating the communication knows that   [*88]   all of the
recipients are minors.

    II

    Whether the CDA substantially interferes with the First Amendment
rights of minors, and thereby runs afoul of the second characteristic of
valid zoning laws, presents a closer question. In Ginsberg, the New York
law we sustained prohibited the sale to minors of magazines that were
"harmful to minors." Under that law, a magazine was "harmful to minors"
only if it was obscene as to minors. 390 U.S. at 632-633. Noting that
obscene speech is not protected by the First Amendment, Roth v. United
States, 354 U.S. 476, 485, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957), and
that New York was constitutionally free to adjust the definition of
obscenity for minors, 390 U.S. at 638, the Court concluded that the law
did not "invade the area of freedom of expression constitutionally
secured to minors." 390 U.S. at 637. New York therefore did not infringe
upon the First Amendment rights of minors. Cf. Erznoznik v.

Jacksonville, 422 U.S. 205, 213, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975) (striking down city ordinance that banned nudity that was not "obscene even as to minors").

The Court neither "accepts nor rejects" the argument that the CDA is facially overbroad because it substantially interferes with the  [*89] First Amendment rights of minors. Ante, at 32. I would reject it. Ginsberg established that minors may constitutionally be denied access to material that is obscene as to minors. As Ginsberg explained, material is obscene as to minors if it (i) is "patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable . . . for minors"; (ii) appeals to the prurient interest of minors; and (iii) is "utterly without redeeming social importance for minors." 390 U.S. at 633. Because the CDA denies minors the right to obtain material that is "patently offensive"--even if it has some redeeming value for minors and even if it does not appeal to their prurient interests--Congress' rejection of the Ginsberg "harmful to minors" standard means that the CDA could ban some speech that is "indecent" (i.e., "patently offensive") but that is not obscene as to minors.

I do not deny this possibility, but to prevail in a facial challenge, it is not enough for a plaintiff to show "some" overbreadth. Our cases require a proof of "real" and "substantial" overbreadth, Broadrick v. Oklahoma, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973), and appellees have  [*90]  not carried their burden in this case. In my view, the universe of speech constitutionally protected as to minors but banned by the CDA--i.e., the universe of material that is "patently offensive," but which nonetheless has some redeeming value for minors or does not appeal to their prurient interest--is a very small one. Appellees cite no examples of speech falling within this universe and do not attempt to explain why that universe is substantial "in relation to the statute's plainly legitimate sweep." Ibid. That the CDA might deny minors the right to obtain material that has some "value," see ante, at 32-33, is largely beside the point. While discussions about prison rape or nude art, see ibid., may have some redeeming education value for adults, they do not necessarily have any such value for minors, and under Ginsberg, minors only have a First Amendment right to obtain patently offensive material that has "redeeming social importance for minors," 390 U.S. at 633 (emphasis added). There is also no evidence in the record to support the contention that "many [e]-mail transmissions from an adult to a minor are conversations between family members," [*91]  ante, at 18, n.32, and no support for the legal proposition that such speech is absolutely immune from regulation. Accordingly, in my view, the CDA does not burden a substantial amount of minors' constitutionally protected speech.

Thus, the constitutionality of the CDA as a zoning law hinges on the extent to which it substantially interferes with the First Amendment rights of adults. Because the rights of adults are infringed only by the "display" provision and by the "indecency transmission" and "specific person" provisions as applied to communications involving more than one adult, I would invalidate the CDA only to that extent. Insofar as the "indecency transmission" and "specific person" provisions prohibit the use of indecent speech in communications between an adult and one or more minors, however, they can and should be sustained. The Court reaches a contrary conclusion, and from that holding that I respectfully dissent.